2011 Ark. App. 560

**ST. JOSEPH'S MERCY HEALTH CENTER, Appellant**

v.

**Melissa EDWARDS and John Edwards, Appellees.**

No. CA 10–1015.

Court of Appeals of Arkansas.

Sept. 28, 2011.

David Parker Glover, Gary D. Marts, Little Rock, for appellant.

Julia L. Busfield, Little Rock, for appellees.

LARRY VAUGHT, Chief Judge.

⌊₁Appellant St. Joseph's Mercy Health Center appeals a $210,000 judgment in favor of appellees Melissa Edwards and John Edwards, individually and as parents and natural guardians of Caleb Edwards, a minor. On appeal, St. Joseph's argues that the trial court abused its discretion in permitting speculative testimony given by Dr. Joe Dunaway and in denying a motion for new trial or remittitur based on a grossly excessive jury award. We affirm.

On February 21, 2002, six-month-old Caleb was in the process of being discharged from St. Joseph's (located in Hot Springs) after being admitted for a respiratory condition. As nurse Sandy Reed was removing tape that was securing Caleb's intravenous tubing, she severely cut Caleb's left index finger at the distal interphalangeal joint. Caleb's parents, Melissa and John, were in the room at the time and heard Caleb shriek in pain. John saw that Caleb's finger was nearly amputated, hanging from the skin on the underside of the finger. An orthopedic surgeon from St. Joseph's advised the Edwardses that he would try to reattach the finger. However, the ⌊₂Edwardses elected to have Caleb treated at Children's Hospital in Little Rock by Dr. Andrew Markiewitz, an orthopedic surgeon specializing in hand surger-

ies. Caleb was given morphine for pain and transported to Children's Hospital, where Dr. Markiewitz and his team immediately performed surgery.

Caleb was released from Children's Hospital two days after surgery with a pin in his finger, a cast on his arm, and pain medication. Caleb had a difficult time with the cast and because it came off a couple of times he had to return to the hospital to have it replaced. In addition, the pin that was inserted in Caleb's finger came out during his convalescence. Following his discharge, Caleb received twice-a-day shots of a blood thinner given to him by a home-health-care nurse and Melissa.

Caleb's first follow-up visit with Dr. Markiewitz was on March 15, 2002. On that date, the doctor opined that in the future Caleb would suffer from growth retardation, posttraumatic arthritis and deformity, and stiffness in the injured finger. Caleb was seen four more times at the orthopedic clinic at Children's Hospital for follow-up visits; the last visit being on February 12, 2003. On that date, he was seen by Dr. Randipsingh Bindra, who noted a circumferential scar on Caleb's left index finger that had healed satisfactorily, no evidence of growth arrest in the left finger, stiffness in the severed joint, and loss of about fifty percent of his range of motion in the affected joint.

The next medical treatment Caleb received for his finger was in September 2006, when he was seen by his family practitioner Dr. Dunaway. Dr. Dunaway ordered x-rays that demonstrated "a fairly normal looking finger. Epiphysial growth plate is still open, but does appear to be closing at this time. Otherwise, no acute findings." In a letter authored by Dr. Dunaway on September 26, 2006, he wrote:

There is a scar on the dorsal side and some on the ventral side. He has decreased ability to flex the end of his finger. He has decreased sensation in the end of his finger. I can prick him with a sharp object and he has no feeling.... On measuring his fingers his left second finger is 4 3/4 cm and his right second finger is 5 1/2 cm so there is a difference in size.... I feel it will definitely always be shorter. He will never have the full use or sensation of his finger. He will more than likely develop arthritis and pain at an earlier age than normal. He will be limited in the fine motor movement and sensation of his left second finger on the end. This will be a permanent disability and a permanent difference in the size of the other DIP joint of the right hand. These things I can directly attribute to the amputation of that finger.

On April 6, 2010, at the request of defense counsel, Caleb's finger was examined by Dr. Jeff Johnson, who opined that Caleb had steady improvement from the near amputation of his left index finger. While he did not recommend surgery, Dr. Johnson opined that Caleb's left index finger had loss of motion at the joint in question; decreased sensation; decreased length as compared to the right, with a discrepancy that will persist; and a closed dorsal growth plate.

At trial, St. Joseph's admitted liability. On the issue of Caleb's damages, the jury was instructed that the available measure of damages included (a) the nature, extent, duration, and permanency of any injury; (b) any pain and suffering and mental anguish experienced in the past and reasonably certain to be experienced in the future; and (c) any scars and disfigurement. AMI Civ. 2201. The jury returned a verdict in the amount of $210,000, and the trial court entered a judgment for that amount. St. Joseph's moved for a new trial, arguing that the damages were excessive. The trial court denied the motion,

and St. Joseph's filed this timely appeal, arguing that the trial court abused its discretion in permitting the speculative testimony of Dr. Dunaway and in denying its motion for new trial or remittitur because the jury's award was grossly excessive.

The standard of review applicable to St. Joseph's first point on appeal—challenging the admission of evidence—is abuse of discretion. *FMC Corp. v. Helton*, 360 Ark. 465, 479, 202 S.W.3d 490, 500 (2005). Abuse of discretion is a high threshold that does not simply require error in the trial court's decision, but requires that the trial court act improvidently, thoughtlessly, or without due consideration. *Id.* at 479, 202 S.W.3d at 500. We will not reverse a trial court's ruling on the admission of evidence absent a showing of prejudice. *Aday v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 677, at 4, 2010 WL 3902438.

On appeal, St. Joseph's argues that the trial court erred in allowing Dr. Dunaway to give speculative testimony, including Caleb's ability to play sports, his future limitations, his decreased dexterity in the finger, his being exposed to ridicule because of his finger, and his current ability to use his finger. However, St. Joseph's did not object to all of this testimony below. Its motion in limine and arguments in support thereof sought only to prevent Dr. Dunaway from testifying that Caleb's growth plate had closed, which would result in future problems like arthritis. These other arguments now made by St. Joseph's are being raised for the first time on appeal. Our case law has made clear that this court will not consider arguments made for the first time on appeal. *Greenwood v. Anderson,* 2009 Ark. 360, at 4, 324 S.W.3d 324, 326. Appellant must raise an issue with specificity and make an argument to the trial court for it to be preserved on appeal. *Id.* at 4, 324 S.W.3d at 326.

The argument that is preserved for appeal is whether the trial court abused its discretion in permitting Dr. Dunaway to testify that Caleb's growth plate had closed, which could cause arthritis. For support, St. Joseph's argues that Dr. Dunaway conceded that the testimony was speculative by answering "no" to defense counsel's question whether Caleb "can expect within a reasonable degree of medical certainty to get arthritis when he's in his 20s or 30s." Citing *Jacuzzi Bros., Inc. v. Todd,* 316 Ark. 785, 875 S.W.2d 67 (1994), and *E–Ton Dynamics Indus. Corp. v. Hall,* 83 Ark. App. 35, 115 S.W.3d 816 (2003), St. Joseph's states that "speculative expert testimony is never admissible."

While Dr. Dunaway's opinion—that the growth plate in Caleb's left index had closed, which might cause arthritis—may have been speculative, St. Joseph's has failed to show how the admission of his testimony prejudiced St. Joseph's where that same testimony was introduced into evidence during other portions of Dr. Dunaway's testimony and by two other doctors. In testimony to which St. Joseph's did not object, Dr. Dunaway testified that, relying on x-rays, Caleb's dorsal growth plate was closed and his left index finger was shorter than the right. Dr. Markiewitz testified, without objection, that one of the possible future outcomes of Caleb's injury was growth retardation and post-traumatic arthritis. Similarly, Dr. Johnson, who ordered and interpreted x-rays of Caleb's finger, opined that there were length discrepancies between Caleb's right and left index fingers and that Caleb's left-dorsal growth plate had closed. All of this testimony is nearly identical to the challenged testimony of Dr. Dunaway. We will not reverse a trial court's ruling on the admission of evidence absent a showing of

prejudice. *Aday,* 2010 Ark. App. 677, at 4. Accordingly, St. Joseph's argument on this point is without merit.

St. Joseph's second point on appeal is that the trial court abused its discretion in denying its motion for new trial or remittitur because the jury's award was grossly excessive. Where an award of damages is alleged to be excessive, we review the proof and all reasonable inferences most favorably to the appellee and determine whether the verdict is so great as to shock the conscience of the court or demonstrates passion or prejudice on the part of the jury. *Vaccaro Lumber v. Fesperman,* 100 Ark. App. 267, 269, 267 S.W.3d 619, 621 (2007). Remittitur is appropriate when the compensatory damages awarded are excessive and cannot be sustained by the evidence. *Vaccaro Lumber,* 100 Ark. App. at 269, 267 S.W.3d at 621. The standard of review in such a case is whether there is substantial evidence to support the verdict. *Id.,* 267 S.W.3d at 621. We will review a trial court's denial of a motion for new trial or order of remittitur based on excessive damages for abuse of discretion. *Id.,* 267 S.W.3d at 621.

In determining whether the amount of damages is so great as to shock the conscience of this court, we consider such elements as past and future medical expenses, permanency of the injury, loss of earning capacity, scars resulting in disfigurement, and pain, suffering, and mental anguish. *Id.,* 267 S.W.3d at 622. We make this determination on a case-by-case basis with little reliance on prior decisions, as "precedents are of scant value in appeals of this kind." *Id.,* 267 S.W.3d at 622 (quoting *Matthews v. Rodgers,* 279 Ark. 328, 335, 651 S.W.2d 453, 457 (1983)).

Keeping only those damages elements applicable in this case in mind—permanency, scars and disfigurement, and pain, suffering, and mental anguish—we hold that substantial evidence supports the jury's award of $210,000. Caleb suffered a near amputation of his left index finger. All three individuals who were in the room when Caleb's finger was severed testified that he screamed in pain. His parents described it as a "horrific shriek." Caleb spent two days at Children's Hospital after surgery and was discharged with pain medication.

For two weeks after his discharge, a home-health-care nurse and his mother, Melissa, administered shots in Caleb's legs, twice a day. Melissa testified that after several shots, Caleb started crying as soon as he saw the nurse arrive. For six weeks after his discharge, his left hand and arm were in a cast. Because of his infancy, he threw off the cast multiple times, resulting in a cast that extended up to his shoulder and was fastened to his torso. Melissa testified that Caleb's cast rubbed his skin raw and that he hit himself all over his body (including his head and face) with the cast. There was testimony that Caleb could not lie on his belly and could not hold his bottle. As he was learning to walk, when he fell to the left side, he just fell over because he had no way to catch himself. After the cast was removed, his hand was splinted for four weeks. Melissa and John testified that Caleb did not use his finger for a year after the accident. Melissa said that Caleb lacked some sensation in his finger because one time he burned it on a light bulb (causing it to blister), but he did not feel it. She also testified that Caleb would bite the nail on his left index finger until it would bleed because he did not feel it.

Additionally, there was medical evidence, as outlined above, that Caleb's left index finger was already shorter than his right, that the length disparity would continue in the future because his dorsal growth plate had closed, that he had a loss

of sensation in his finger, and that there was scarring. The jury was presented with pictures of Caleb as an infant with the casts and when the casts were removed. The jury also saw Caleb's finger at trial.

|₈We acknowledge that there was evidence that Caleb had steady improvement in his finger following the surgery to reattach it, that he was a healthy and active young boy, and that he had not needed active medical treatment for his injury in years. However, under our standard of review, we review the proof and all reasonable inferences most favorably to the Edwardses. *Vaccaro Lumber*, 100 Ark. App. at 269, 267 S.W.3d at 621. As outlined above, there was substantial evidence to support the jury's award. As such, we hold that the award is not so great as to shock the conscience of the court or demonstrate passion or prejudice on the part of the jury. Accordingly, we hold that the trial court did not abuse its discretion in denying St. Joseph's motion for new trial or remittitur.

Affirmed.

HOOFMAN and BROWN, JJ., agree.