

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-13-260

| | |
|---|---|
| BILL W. SCHWYHART, CAROLYN SCHWYHART, ROBERT B. THORNTON, FREIDA THORNTON, SCHWYHART HOLDINGS, LLC, and ROBERT B. THORNTON, LLC <br> APPELLANTS <br><br> V. <br><br> J.B. HUNT, LLC, and GRAHAM HOLDINGS, LLC <br> APPELLEES | **Opinion Delivered** May 21, 2014 <br><br> APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. CV-11-2201-6] <br><br> HONORABLE DOUG SCHRANTZ, JUDGE <br><br> AFFIRMED |

**KENNETH S. HIXSON, Judge**

This appeal involves one aspect of the dissolution of a multi-million-dollar multi-jet charter venture—Pinnacle Air, LLC—based in northwest Arkansas. Appellants Bill W. Schwyhart, Carolyn Schwyhart, Robert B. Thornton, Freida Thornton, Schwyhart Holdings, LLC, and Robert B. Thornton, LLC appeal the November 2012 judgment entered against them and in favor of appellees J.B. Hunt, LLC and Graham Holdings, LLC following a lawsuit filed by appellees to enforce indemnity agreements. The indemnity agreements were executed in December 2007 by appellants to protect appellees from liability on Pinnacle Air, LLC's debts to various creditors and lenders. After tendering in excess of $22 million to Pinnacle Air's creditors in 2008, J.B. Hunt, LLC and Graham Holdings, LLC demanded just over $7 million from appellants as their share owed under the indemnity

agreements. Appellants did not remit any payment, and J.B. Hunt, LLC and Graham Holdings, LLC filed suit in September 2011 in Benton County Circuit Court. Appellants resisted this lawsuit contending that it was barred by res judicata, that appellees had assigned their rights of indemnification to a new investor and thus lacked standing to sue, and that there was a failure of notice and proof of payment on the debts by both appellees, among other asserted defenses. After a bench trial, judgment was entered in favor of appellees in the amount of $7,028,575.47, against appellants jointly and severally. Appellants appeal this judgment and present several arguments, but we disagree with the arguments and affirm.

## I. *Facts*

J.B. Hunt, LLC ("J.B. Hunt"), Graham Holdings, LLC ("Graham Holdings"), Schwyhart Holdings, LLC ("Schwyhart LLC"), and Robert B. Thornton, LLC ("Thornton LLC") owned Pinnacle Air, LLC and its affiliates ("Pinnacle Air"). Pinnacle Air acquired approximately twenty Lear Jets and secured financing from various lending institutions.[1] Each loan agreement was executed by Pinnacle Air and personally guaranteed. The guarantors included Bill W. Schwyhart and Robert B. Thornton, individually.

Eventually, J.B. Hunt and Graham Holdings no longer wanted an ownership interest in Pinnacle Air. In December 2007, J.B. Hunt, Graham Holdings, Schwyhart LLC, Thornton LLC, and John P. Calamos doing business as Ajax, LLC ("Calamos") entered into a written investment agreement ("Investment Agreement") in which Calamos purchased

---

[1]Each Lear Jet was acquired by a separate limited liability company. For example, PA Lear 60-076 "PA Lear I" was acquired by PA Lear 60-076, LLC, a Delaware limited liability company. These Lear Jet limited liability companies were affiliates of Pinnacle Air, LLC.

all of the interests of J.B. Hunt and Graham Holdings as well as a portion of interests owned by Schwyhart LLC and Thornton LLC. The Investment Agreement provided that Pinnacle Air would use commercially reasonable efforts to refinance the debts of Pinnacle Air and to obtain releases of J.B. Hunt and Graham Holdings from all personal guaranties and obligations. The Investment Agreement also required Schwyhart LLC, Thornton LLC, Bill and Carolyn Schwyhart, Robert and Freida Thornton, and Calamos to execute indemnity agreements to protect J.B. Hunt and Graham Holdings from liability to Pinnacle Air's creditors.[2] Calamos executed an indemnity agreement referred to herein as the "Calamos indemnity agreement" and Schwyhart LLC, Thornton LLC, Bill and Carolyn Schwyhart, and Robert and Freida Thornton executed a separate indemnity agreement referred to herein as the "Schwyhart indemnity agreement."

Fifth Third Bank financed the purchase of two of the Lear Jets by Pinnacle Air in 2005.[3] After the Investment Agreement, Calamos indemnity agreement and Schwyhart indemnity agreement were executed in 2007, the notes on these two Lear Jets went into default, and Fifth Third Bank demanded payment. Despite the fact that J.B. Hunt was no longer a member of Pinnacle Air, pursuant to its personal guaranty agreement granted to Fifth Third Bank, which had not been released, J.B. Hunt tendered payment in full to Fifth Third Bank on the two defaulted Lear Jet notes in the amounts of $5,125,233.38 and $5,605,878.07

---

[2]A schedule of the "Hunt/Graham Guaranties" listed as protected by the two indemnity agreements included more than forty separate obligations to various entities.

[3]PA Lear 60-076 "PA Lear I" and PA Lear 60-098 "PA Lear II."

3

in December 2008. In return for payment, Fifth Third Bank assigned all of its rights and interests in the two notes to J.B. Hunt in an Assignment and Assumption Agreement. Shortly thereafter in February 2009, J.B. Hunt sued Bill W. Schwyhart and Robert B. Thornton on their limited personal guaranties of thirty-two percent of the indebtedness on PA Lear I and PA Lear II seeking payment solely on the assigned Fifth Third Bank notes. Liability was established in August 2009, but a trial was conducted to determine precise damages and the commercial reasonableness of J.B. Hunt's liquidation of those two jets. This lawsuit is referred to as "Suit I." In March 2010, the trial court granted J.B. Hunt judgment against Bill W. Schwyhart and Robert B. Thornton, individually, in the amount of $2,713,447 each.[4]

Other Pinnacle Air notes and liabilities were coming due or were in default. A total of $22,028,575 was paid by J.B. Hunt and Graham Holdings to various lenders as a result of their personal guaranties. These payments invoked the Calamos indemnity agreement and the Schwyhart indemnity agreement. Calamos, pursuant to his separate indemnity agreement, paid J.B. Hunt $15,000,000 to satisfy his indemnity agreement obligations, which left a balance due of $7,028,575.47.

J.B. Hunt and Graham Holdings made demand for the remaining $7,028,575.47 on Schwyhart LLC, Thornton LLC, Bill and Carolyn Schwyhart, and Robert and Freida Thornton. Nothing was remitted in accordance with the Schwyhart indemnity agreement,

---

[4]This amount represented thirty-two percent of the indebtedness, which included principal, accrued interest, expenses, and prepayment penalty, less the proceeds from the sale of the two jets that were collateral for these two bank notes. The court also granted attorney fees, costs and postjudgment interest on both judgments.

so J.B. Hunt and Graham Holdings filed suit in September 2011 in Benton County Circuit Court against the appellants, Schwyhart LLC, Thornton LLC, Bill and Carolyn Schwyhart, and Robert and Freida Thornton alleging breach of the Schwyhart indemnity agreement. This case is referred to herein as "Suit II." The lawsuit was filed in Division IV, which is presided over by the Hon. John R. Scott. Shortly after the lawsuit was filed, Judge Scott transferred the case to Division VI presided over by the Hon. Doug Schrantz. Following a bench trial, judgment was entered against the defendants, jointly and severally, in the amount of $7,028,575.47. This appeal followed.

### III. *Res Judicata*

Appellants contend that this lawsuit, Suit II, is barred by res judicata because of Suit I. Res judicata bars the relitigation of subsequent lawsuits when (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based upon proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies. *Moon v. Marquez*, 338 Ark. 636, 999 S.W.2d 678 (1999).

Appellants initially raised the defense of res judicata in a motion for summary judgment, which the trial court denied as premature with material issues of fact remaining. Appellants contend that the trial court erred in denying their motion for summary judgment. The denial of summary judgment is not reviewable on appeal, and such review is not available even after a trial on the merits. *Murphy Oil USA, Inc. v. Unigard Sec. Ins. Co.*, 347 Ark. 167,

61 S.W.3d 807 (2001); *Ball v. Foehner*, 326 Ark. 409, 412, 931 S.W.2d 142, 144 (1996). This argument is without merit.

During the bench trial, the trial court considered whether res judicata barred this suit and concluded that the current lawsuit (Suit II), seeking to enforce the Schwyhart indemnity agreement against Schwyhart LLC, Thornton LLC, Bill and Carolyn Schwyhart, and Robert and Freida Thornton, represented an independent, separate obligation and was different from the individual guaranty agreements signed only by Bill W. Schwyhart and Robert B. Thornton for the benefit of Fifth Third Bank or its assigns, which was litigated in Suit I.

When reviewing whether this action is barred by res judicata, we note that Suit I resulted in a final judgment on the merits, was based on proper jurisdiction, and was fully contested in good faith. Therefore, our analysis is limited to whether Suits I and II involve the same claim or cause of action and the same parties or their privies. An absence of either element would negate the application of res judicata.

To determine whether the lawsuits involve the same claim or cause of action, the test is whether matters presented in a subsequent suit were necessarily within the issues of the former suit and might have been litigated therein; when a new action is based on the same events and subject matter as the previous case, and only raises new legal issues and seeks additional remedies, the case is barred by res judicata. *Elder v. Mark Ford & Assoc.*, 103 Ark. App. 302, 304, 288 S.W.3d 702, 704 (2008). The trial court did not clearly err in finding that res judicata did not bar Suit II.

Suit I involved only the two defaulted notes to Fifth Third Bank. When J.B. Hunt satisfied those two loans in exchange for an assignment and assumption of the bank's rights and guaranties, J.B. Hunt stepped into the shoes of Fifth Third Bank and became, for all intents and purposes, the bank. Suit I concerned the reasonableness of the sale of the collateral that secured those two notes and the determination of a final sum due. Graham was not a part of that litigation, nor could Graham have been, given that Graham did not acquire the bank's rights on assignment; only J.B. Hunt did. There was no full and fair opportunity to litigate a breach of the Schwyhart indemnity agreement in Suit I because the indemnity agreement was not the basis for Schwyhart's and Thornton's individual liability on those two particular jets.

In Suit II, Pinnacle Air had defaulted on many of the other eighteen Lear Jet notes or other Pinnacle Air financial obligations, and various lending institutions had demanded payment on the personal guaranties. J.B. Hunt paid $22,028,575 to various lending institutions "on behalf of Hunt and Graham"[5] to satisfy these debt obligations. None of this

---

[5]The Certificate of Payment provided:

The undersigned, being the Manager of J.B. Hunt, LLC, an Arkansas limited liability company (the "Hunt"), pursuant to Section 2(c) of that certain Indemnity Agreement dated as of December 5, 2007 (the "Indemnity Agreement") by and between Hunt, Graham Holdings, LLC ("Graham"), and Bill W. Schwyhart, Carolyn Schwyhart, Schwyhart LLC, Robert B. Thornton, Freida Thornton and Robert B. Thornton, LLC (collectively the "Indemnifying Parties"), hereby certifies that the payments have been made on behalf of Hunt and Graham in connection with the Guarantees (as that term is defined in the Indemnity Agreement) in the amount of $22,028,575.47; provided such amount is not intended to be an exclusive listing of all payments made to date in connection with the Guarantees.

amount went toward the previously-litigated Fifth Third Bank debt. No bank-note assignments were issued on these other debts. The payment of this sum triggered the indemnity provisions of the Investment Agreement, the Calamos indemnity agreement[6] and the Schwyhart indemnity agreement. Indemnity agreements are contracts. *Ray & Sons Masonry Contractors, Inc. v. U.S. Fid. & Guar. Co.*, 353 Ark. 201, 114 S.W.3d 189 (2003). J.B. Hunt demanded payment for the remaining balance of $7,028,575 from appellants pursuant to the Schwyhart indemnity agreement, and they each refused to pay, triggering a cause of action for breach of this distinct contractual agreement.

Appellants now argue that because the claims and causes of action all arise out of debt obligations related to Pinnacle Air, J.B. Hunt should have included the current cause of action for breach of the Schwyhart indemnity agreement in Suit I and therefore, that claim was barred by res judicata in Suit II. We disagree. As explained, the claims and causes of action in Suit I are not the same claims or causes of action in Suit II, and the trial judge was correct when he found that this lawsuit (Suit II) involved a separate and independent obligation.

Moreover, even though appellants concede that the trial court did not rule on the "same parties or their privies" aspect of res judicata, we hold that assuming arguendo, that the two suits did involve the same claims or causes of action, it is apparent that Suit I and Suit II do not involve the same parties or their privies. J.B. Hunt was the plaintiff in Suit I. There was no evidence or allegation that Graham Holdings was a payor on this obligation or an assignee of the Fifth Third Bank assignment. Therefore, Graham Holdings could not have

---

[6]John Calamos subsequently remitted $15,000,000 to J.B. Hunt to satisfy his obligation and is not a party to this litigation.

8

joined J.B. Hunt in Suit I and no privity of parties exist. In contrast, the plaintiffs in Suit II were J.B. Hunt *and* Graham Holdings in that the Certificate of Payment stated that $22,028,575 in payments were made "on behalf of Hunt and Graham." Further, the defendants in Suit I were Bill W. Schwyhart and Robert B. Thornton, individually. The defendants in Suit II were Bill W. Schwyhart, Robert B. Thornton *and* Schwyhart LLC, Thornton LLC, Carolyn Schwyhart, and Freida Thornton, who were the signatories to the Schwyhart indemnity agreement. Clearly, the two suits did not involve the same parties.

The trial court properly ruled that the doctrine of res judicata was not applicable, and we affirm on this point. *See Skallerup v. City of Hot Springs*, 2009 Ark. 276, 309 S.W.3d 196.

IV. *Assignment of the Indemnity Agreement*

Appellants next contend that the trial court erred when it found that J.B. Hunt and Graham Holdings had the right to sue pursuant to the indemnity agreement with the appellants. They claim that the Schwyhart indemnity agreement was assigned to Calamos and that this assignment extinguished J.B. Hunt and Graham Holdings' rights to sue on the agreement. We disagree.

First and foremost, the indemnity agreement signed by the parties, and cited to us by appellants, provided among other things that "this indemnity may not be assigned by any party without the prior written consent of the other parties." There is no allegation or evidence of any such written authorization. Tim Graham and Johnelle Hunt admitted that they had settled with Calamos with regard to his separate indemnity agreement, but both of them specifically denied that the Schwyhart indemnity agreement was assigned. Each of them admitted that they agreed with Calamos that, in the event they recovered any money from

9

pursuing their rights under the Schwyhart indemnity agreement, they would tender any recovery over to Calamos, but such an agreement was part of a settlement agreement with Calamos. The trial court's ruling that J.B. Hunt and Graham Holdings had the right to sue pursuant to the indemnity agreement was not clearly erroneous given that there was no evidence to support the existence of a valid assignment.

Within this argument, appellants contend that they were inappropriately prevented from proving the existence of an alleged assignment by eliciting evidence from Tim Graham and Michael Bond, an attorney who previously represented appellants. Each time this evidence was presented, timely objections were raised by appellees and sustained by the trial court. Appellants claim that the trial court abused its discretion in sustaining these objections. Abuse of discretion is "a high threshold that does not simply require error in the trial court's decision, but requires that the trial court act improvidently, thoughtlessly, or without due consideration." *St. Joseph's Mercy Health Ctr. v. Edwards*, 2011 Ark. App. 560, at 4, 385 S.W.3d 849, 852. Additionally, a trial court's ruling will not be reversed on the admission or rejection of evidence "absent a showing of prejudice." *Id*.

We need not decide whether the trial court abused its discretion in these evidentiary rulings because none of the evidence sought to be introduced would have established the existence of a prior written consent by all the parties to the Schwyhart indemnity agreement to an assignment of it. Absent such a prior written consent, no alleged assignment would be valid, rendering the evidentiary rulings related to this issue non-prejudicial and moot. *Howard v. Adams*, 2012 Ark. App. 562, 464 S.W.3d 337; *Milner v. Luttrell*, 2011 Ark. App. 297, 384 S.W.3d 1.

10



### V. *The Breach of Contract Claim*

The crux of this case is whether appellants breached their indemnity agreement with appellees. In order to prove a breach–of–contract claim, one must prove "the existence of an agreement, breach of the agreement, and resulting damages." *Ultracuts Ltd. v. Wal-Mart Stores, Inc.*, 343 Ark. 224, 231–32, 33 S.W.3d 128, 133 (2000). Again, we conduct our review by determining whether the trial court's findings were clearly erroneous or clearly against the preponderance of the evidence. *DC Xpress, LLC v. Briggs*, 2009 Ark. App. 651, at 4, 343 S.W.3d 603, 606.

Appellants' first point in support of this argument is that J.B. Hunt and Graham Holdings never properly demanded payment. The indemnity agreement required that demand for payment be made in writing and sent to the parties via certified mail listing a single address for notice to them all. Appellants now argue that notice was sent to their lawyer and this failure to comply with the indemnity agreement's notice provision caused the appellees to fail to demonstrate a breach. This point is made by appellants for the first time on appeal, and it is well–settled that an appellate court will not consider an argument that was raised for the first time on appeal. *Miner v. State*, 342 Ark. 283, 28 S.W.3d 280 (2000).

The second point raised is that Graham Holdings failed to prove that it sustained damages as a result of the breach. "An indemnitee . . . must show that he has suffered actual loss by payment or satisfaction of a judgment or by other payment under compulsion." *Larson Mach., Inc. v. Wallace*, 268 Ark. 192, 214–15, 600 S.W.2d 1, 13 (1980).

The trial court found that J.B. Hunt and Graham Holdings had standing to sue under the Schwyhart indemnity agreement and the Certificate of Payment specifically indicates that

11

$22 million was paid on behalf of J.B. Hunt and Graham Holdings. The Certificate of Payment represented several wire transfers including some that were initiated by Big Horn Lodge Financing, LLC, a pass-through entity of J.B. Hunt. Tim Graham testified that he paid J.B. Hunt money to satisfy his portion of the obligation, but he could not testify to an exact amount he paid. The trial judge found that the Certificate of Payment sufficiently proved that J.B. Hunt and Graham Holdings sustained damages, the indemnity agreement was designed to protect J.B. Hunt and Graham Holdings collectively, and this finding was not clearly erroneous as the Certificate of Payment is sufficient proof of the damages sustained by both Hunt and Graham.

## VI. *Transfer of the Case*

We easily dispose of the final point on appeal. Appellants contend that it was reversible error for Hon. Doug Schrantz to accept the transfer of this case from Hon. John R. Scott. This argument was never raised at the lower court, and it is well-settled that an appellate court will not consider an argument that is raised for the first time on appeal. *Miner v. State*, 342 Ark. 283, 28 S.W.3d 280 (2000).

## VII. *Conclusion*

None of the arguments advanced by appellants present this court with a basis for reversal. Therefore, the trial court's decision is affirmed.

Affirmed.

PITTMAN and WOOD, JJ., agree.

*Story Law Firm, PLLC*, by: *Travis W. Story* and *Ryan Renauro*, for appellants.

*Rose Law Firm*, a Professional Association, by: *Richard T. Donovan* and *Amanda K. Wofford*, for appellees.