RITA W. GRUBER, Chief Judge
Appellant Tami Darr appeals from the Pulaski County Circuit Court's order setting aside a will, removing Ms. Darr as personal representative, and appointing the son of appellee Francis Jean Billeaudeau as personal representative. Ms. Darr contends that the court erred in setting aside the will and in excluding an audiotape recording of the execution of the will. We affirm the circuit court's order.
*462 The decedent, Stephen Michael Herman, passed away on April 18, 2014, leaving a will that he executed on January 14, 2014, of which Ms. Darr was the sole beneficiary. Ms. Darr's mother had been married to Mr. Herman for three years in the 1970s; Ms. Billeaudeau was Mr. Herman's older half sister. Mr. Herman had no other family.
At trial, James Drew testified that he was a close friend of Mr. Herman's, had known him for more than thirty years, and had worked with him for almost nineteen years. He testified that he spoke to Mr. Herman weekly during 2013 and noticed in late 2013 that Mr. Herman was in a state of physical decline. He also testified that Mr. Herman's short-term memory "was gone" and that, on Veterans' Day in November 2013, while they were having lunch, Mr. Herman had a seizure after which paramedics took him to Baptist Hospital where he remained for at least a week.
Hospital records introduced at trial revealed that Mr. Herman was later admitted to UAMS Medical Center on December 18, 2013, suffering from memory loss, confusion, paranoia, and inability to care for himself. He remained hospitalized until December 27, 2013, and was diagnosed with "moderate to severe dementia." On December 26, 2013, Ms. Darr visited Mr. Herman in the hospital after having been contacted by Mr. Drew. It is not clear from the record exactly when Ms. Darr and Mr. Herman had been in touch before then. Ms. Darr testified that she had spoken sporadically with Mr. Herman by phone over the years but that neither she nor Mr. Herman had ever visited the other's home. She also said that she and her husband had visited with Mr. Herman on a bench in Park Hill after seeing each other walking in November 2013.
Ms. Darr said that when she returned to the hospital on December 27, 2013, Mr. Herman asked her to contact an attorney to prepare a power of attorney to assist with his transfer to a rehabilitation center. Ms. Darr had a power of attorney prepared and brought the document to Mr. Herman for execution on December 29, 2013. Sometime between December 27 and 29, 2013, Ms. Darr assisted Mr. Herman in moving from UAMS to Sandalwood Healthcare, a residential rehabilitation facility. Ms. Darr's husband, Andrew Darr, began visiting Mr. Herman regularly, and on January 2, 2014, he learned that Mr. Herman did not have a will. Later that week, Ms. Darr scheduled an appointment with an attorney, Lisa Douglas, regarding preparation of a will for Mr. Herman. Ms. Darr testified that she never discussed a will with Mr. Herman or made him aware that she had made an appointment with Ms. Douglas regarding a will.
On January 10, 2014, the Darrs met with Ms. Douglas. Ms. Darr testified that she provided Ms. Douglas with the power of attorney and with information about Mr. Herman's estate, including his property, his financial accounts, his retirement accounts, and land he owned in Roland, Arkansas. She said that she never spoke with Mr. Herman about the meeting or informed him that the meeting had taken place. Ms. Douglas drafted Mr. Herman's will, which comprised one page and provided in pertinent part as follows:
ARTICLE II.
I have no children. I give, devise, and bequeath all my property whether real, personal, or mixed, wherever, or however situated or located to Tami Thomas Darr. Because of Tami's love, care, and devotion to me, I leave all my property to her.
ARTICLE III.
I hereby nominate, constitute and appoint Tami Thomas Darr, as Executor of my estate under this, my Last Will and *463 Testament, to serve without bond and without compensation.
Ms. Darr testified that she was not aware until after Mr. Herman's death that she was the primary beneficiary, and she stated that she thought Ms. Douglas had "assumed" that Ms. Darr would be the primary beneficiary. Ms. Darr, having power of attorney for Mr. Herman, wrote a check to Ms. Douglas to pay for her services.
Mr. Darr testified that he retrieved the will from Ms. Douglas and secured witnesses for its execution-his friend and coworker, John Spencer, and the office manager at Sandalwood, Pamela Ford-and a notary, Mr. Spencer's wife.[1] On January 14, 2014, Mr. Herman executed the will at Sandalwood in the presence of the two witnesses, the notary, and Mr. Darr. Mr. Darr testified that he recorded the event because it was "common practice" from his former training in law enforcement. Mr. and Ms. Spencer and Ms. Ford testified that, in their opinions, Mr. Herman had a general idea of what he owned, knew that he was executing a will, and knew to whom he wanted to give his property. All also testified that he was able to communicate and ask questions and appeared to know what he was doing. None of the three knew whether he had been diagnosed with dementia or felt qualified to testify regarding such a diagnosis. Mr. Darr stated that Ms. Darr did not attend the event because he had told her that Ms. Douglas had advised him she should not be there. Mr. Darr said he put the will in their safe after it had been executed. He also said that he did not recall whether he told Ms. Darr that she was the sole beneficiary of the will because they did not "spend much time discussing the will." Ms. Darr testified that, while she was aware the will was in their safe, she had never read it and did not know that she was the sole beneficiary.
Finally, the parties entered certain stipulations verified by Ms. Douglas regarding the drafting of Mr. Herman's will. According to the stipulations, Ms. Douglas never met or spoke with Mr. Herman; she was contacted by the Darrs regarding Mr. Herman's will and drafted Mr. Herman's will "after gathering information provided to her by Tami Darr and Andrew Darr"; she did not receive any written form of communication from Mr. Herman; she "received all information and knowledge she ha[d] regarding Mr. Herman through communications with Tami and Andrew Darr"; and she was not present at the execution of the will.
In early January, Ms. Darr began writing checks for several thousand dollars each from Mr. Herman's account to Mr. Darr and herself for "estate expenses" as "payment for services." There were also several notations on the Darrs' "receipts" for these checks regarding fast food, gas, groceries, and sundries. Ms. Darr continued to issue these checks through the end of March 2014. On January 28, 2014, the Darrs assisted Mr. Herman in moving from Sandalwood to Andover Place, a senior-living apartment complex that provided meals and transportation for its residents. A discharge summary from the Sandalwood director of rehabilitation stated that Mr. Herman demonstrated mild to moderate cognitive-linguistic deficits, mild to moderate deficits in short-term-memory recall, and extreme deficits in tasks that required sustained attention.
In mid-March, Ms. Darr sold Mr. Herman's home, resulting in net equity of $48,000. On March 17, 2014, Ms. Darr wrote a check from Mr. Herman's account to Absolute Construction, a business owned by the Darrs, for $50,000. She testified that $32,000 was for a home for Mr. Herman and $18,000 was to rehabilitate *464 the home. On March 21, 2014, she purchased a home "for Mr. Herman's benefit." The warranty deed listed the Darrs as grantees. At the time of Mr. Herman's death, the property had not been transferred into Mr. Herman's name. Ms. Darr testified that the home was purchased in the Darrs' name so they could rehabilitate the property as homeowners because Mr. Darr did not have a contractor's license. Ms. Darr gave Mr. Herman a copy of the contract on March 31, 2014. Mr. Herman revoked Ms. Darr's power of attorney on April 1, 2014.
Mr. Drew testified that he had visited Mr. Herman weekly at Sandalwood and then at Andover Place. He said sometime while Mr. Herman was at Andover Place, Mr. Herman stopped returning his phone calls. He said Mr. Herman's attitude toward him was not typical and that they renewed their normal friendship shortly before Mr. Herman's death, about the time that Mr. Herman revoked Ms. Darr's power of attorney.
Mr. Herman passed away on April 18, 2014, and Ms. Darr filed a petition for probate of will and appointment of personal representative on April 29, 2014. The court opened probate on April 30, 2014, and issued letters testamentary to Ms. Darr as personal representative on May 2, 2014. On May 14, 2014, Ms. Billeaudeau filed a motion to contest probate and remove Ms. Darr as personal representative. After hearing testimony and reviewing the evidence presented, the court granted Ms. Billeaudeau's motion to set aside the will, removed Ms. Darr as personal representative, and approved Ms. Billeaudeau's nomination of her son as personal representative of Mr. Herman's estate. The court specifically found that Ms. Darr had procured the will. Because she procured the will, there existed a rebuttable presumption that Mr. Herman lacked testamentary capacity and that the will was obtained through undue influence, which must be rebutted by proof beyond a reasonable doubt. The court found that Ms. Darr had failed to rebut this presumption. The court specifically noted the "questionable credibility and the testimony of the Darrs" concerning the unexplained selection of Ms. Darr as the sole beneficiary of the will, the obtaining by Ms. Darr of a power of attorney before the will was drafted, and the "propriety of the flurry of financial activity" involving Mr. Herman's funds and assets by Ms. Darr immediately prior to Mr. Herman's revocation of her power of attorney. The court found that all of these supported Ms. Billeaudeau's allegation of undue influence and lack of testamentary capacity.
We review probate matters de novo but will not reverse the circuit court's findings of fact unless they are clearly erroneous. Shepherd v. Jones , 2015 Ark. App. 279, at 9, 461 S.W.3d 351, 357. A finding is clearly erroneous when, although there is evidence to support it, the appellate court is left on the entire evidence with the firm conviction that a mistake has been committed. Id. We must also defer to the superior position of the lower court sitting in a probate matter to weigh the credibility of the witnesses. Robinson v. Estate of Robinson , 2016 Ark. App. 130, at 5, 485 S.W.3d 261, 264.
I. Whether Circuit Court Erred in Finding That Ms. Darr Procured the Will and Failed to Rebut Presumption
Ms. Darr argues that she met her burden of proving the elements of a valid will, placing the burden on Ms. Billeaudeau to present evidence to rebut this evidence. She contends that Ms. Billeaudeau called no witness to do so and thus failed to meet her burden to show lack of capacity or undue influence. She also contends that *465 the circuit court erred in applying its "subjective interpretation" into the "objective proof of a valid will." We turn first to the relevant law.
Specifically, Ms. Darr contends that she provided witnesses to demonstrate that Mr. Herman had testamentary capacity. This means that the testator must have been able to retain in his mind, without prompting, the extent and condition of his property, to comprehend to whom he was giving it, and relations of those entitled to his bounty. Noland v. Noland , 330 Ark. 660, 665, 956 S.W.2d 173, 176 (1997). Ms. Darr is correct that in a typical will contest, once this has been shown, the party contesting the validity of the will has the burden of proving by a preponderance of the evidence that the testator lacked mental capacity at the time the will was executed or that the testator acted under undue influence. Looney v. Estate of Wade , 310 Ark. 708, 839 S.W.2d 531 (1992). We have long held, however, that the proponent of a will who is a beneficiary and who drafted the will or "caused it to be drafted" has the burden to prove beyond a reasonable doubt that it was not the result of undue influence and that the testator had the mental capacity to make the will. Bell v. Hutchins , 100 Ark. App. 308, 311, 268 S.W.3d 358, 361 (2007) (citing Park v. George , 282 Ark. 155, 159, 667 S.W.2d 644, 647 (1984) ); see also Robinson , 2016 Ark. App. 130, at 10, 485 S.W.3d at 268. In addition, the existence of a confidential relationship between a primary beneficiary and a testator gives rise to a rebuttable presumption of undue influence. Simpson v. Simpson , 2014 Ark. App. 80, at 25, 432 S.W.3d 66, 81. A confidential relationship arises between a person who holds power of attorney and the grantor of that power. Shepherd , 2015 Ark. App. 279, at 12, 461 S.W.3d at 358.
In this case, Ms. Darr held the power of attorney for Mr. Herman at the time the will was executed. Thus, a confidential relationship existed between her, as sole beneficiary of the will, and Mr. Herman, giving rise to a rebuttable presumption of undue influence. Further, we hold that the circuit court's determination that Ms. Darr procured the will in this case is not clearly erroneous. Ms. Darr obtained a power of attorney for Mr. Herman within days of seeing him in the hospital. Within a week of obtaining this document, she contacted an attorney to draft a will for Mr. Herman. Indeed, the Darrs orchestrated the drafting and execution of Mr. Herman's will within three weeks of Ms. Darr's first visit with him in the hospital. Ms. Darr admitted that she had not spoken with Mr. Herman about a will before making the appointment with the attorney, that Mr. Herman did not ask her to have a will drafted for him, that she did not inform him that she had contacted an attorney regarding his will, that only she and Mr. Darr were present at the meeting with the attorney, and that she never spoke with Mr. Herman about either the document or the meeting. She also admits that after the will was executed, it was placed in the Darrs' safe, to which she had access. Mr. Darr obtained witnesses and a notary and told Ms. Darr not to attend the execution of the will because the attorney had said Ms. Darr should not be present. Both Darrs testified that they did not know how Ms. Douglas decided to make Ms. Darr the sole beneficiary of the will. Ms. Douglas did not testify, but the parties entered stipulations verified by her that she never met or had any contact with Mr. Herman, that her information about the will came solely from the Darrs, and that she did not attend the execution of the will.
Ms. Darr argues that because she was not present at the execution of the will, she did not procure the will. We disagree. Ms. *466 Darr was the sole beneficiary of Mr. Herman's will, she held his power of attorney, and she "caused" the will to be drafted. Indeed, we can think of no clearer case of procurement than when the party holding a power of attorney for a testator that has been diagnosed with dementia independently contacts an attorney to draft a will for the testator; fails to inform the testator that she has contacted an attorney; meets with the attorney without the testator's knowledge or presence; provides all of the information regarding the will to the attorney; fails to disclose to, or discuss any of this with, the testator; and retains the executed will in her personal safe. The attorney who drafted the will never spoke with, or had any written or other communication from, the testator. Indeed, Ms. Douglas had never even met Mr. Herman. The mere fact that it was Mr. Darr rather than Ms. Darr who presented the will to the testator, obtained the witnesses, read the will to the testator and witnesses, and orchestrated the execution does not, on the facts of this case, negate that Ms. Darr caused the will to be drafted. To hold otherwise would make a mockery of the law of procurement.
Consequently, the burden was on Ms. Darr to prove beyond a reasonable doubt that the will was not the result of undue influence and that Mr. Herman had the mental capacity to make the will. We have set forth the following precepts in reviewing the evidence in such cases:
The questions of mental competency and undue influence are so closely related and interwoven that we consider them together. Sullivant v. Sullivant , 236 Ark. 95, 364 S.W.2d 665 (1963). In a case where the mind of the testator is strong and alert, the facts constituting undue influence would be required to be far stronger than a case in which the mind of the testator was impaired, such as by disease or advancing age. Short v. Stephenson , 238 Ark. 1048, 386 S.W.2d 501 (1965). Testamentary capacity means that the testator must be able to retain in his mind, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and relations of those entitled to his bounty. Id. The relevant inquiry is not the mental capacity of the testator before or after a challenged will is signed, but rather the level of capacity at the time the will was signed. Pyle v. Sayers , 344 Ark. 354, 39 S.W.3d 774 (2001). Undue influence is defined as "not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property." Short , 238 Ark. at 1049, 386 S.W.2d at 501 (citing McCulloch v. Campbell , 49 Ark. 367, 5 S.W. 590 (1887) ). Undue influence may be inferred from the facts and circumstances of a case, and cases involving questions of undue influence will frequently depend on a determination of witness credibility. Simpson v. Simpson , 2014 Ark. App. 80, 432 S.W.3d 66.
Shepherd , 2015 Ark. App. 279, at 10, 461 S.W.3d at 357.
The medical records from UAMS indicate that Mr. Herman had been diagnosed with dementia weeks before he executed the will and that he suffered from memory loss, confusion, and impaired judgment. The records from Sandalwood where Mr. Herman executed the will report that he had confusion, decreased judgment, cognitive decline, deficits in short-term-memory recall, and deficits in tasks that require sustained attention. Mr. Drew testified that Mr. Herman's short-term memory "was gone" by the end of 2013. Although Ms. Darr introduced the testimony of the Spencers and Ms. Ford, all of whom testified that Mr. Herman *467 seemed fine and alert when he executed his will, none of them testified that he discussed what property he owned and therefore that he was able to retain in his mind, without prompting, the extent and condition of his property. Further, the court recognized, after reviewing the proffered audiotape of the execution, that Mr. Herman "was responsive and alert in general" but found that this simply did not suffice to rebut the presumptions of lack of testamentary capacity and undue influence beyond a reasonable doubt.
Financial documents were entered into evidence showing that Ms. Darr began writing monthly checks to herself and Mr. Darr from Mr. Herman's account for "estate expenses" immediately after she obtained the power of attorney. For example, on January 6, 2014, a week after she obtained a power of attorney, she issued a check in the amount of $3,000.66 to Mr. Darr for estate expenses, which appeared to include $1500 in payment for his management, labor, and administrative assistance at $50 per hour. The remainder included meals, toiletries and cleaning supplies, gas, storage, and payment for help in cleaning Mr. Herman's house. The amounts were detailed on a "service invoice" submitted by Mr. Darr but did not otherwise include receipts. Ms. Darr issued a check to herself on January 6, 2014, for $2,612.24 for estate expenses, with an attached "service invoice" that included parking at UAMS, postal expenses, food, and $1300 as payment for her management, administrative, and labor skills (which included visiting the lawyer and the bank and doing laundry). Checks for similar amounts for "estate expenses" were also issued by Ms. Darr to her and Mr. Darr in early February, early March, and mid-March.
At the same time, Ms. Darr sold Mr. Herman's home, purchased a new home with Mr. Herman's funds, and had the deed designate her and Mr. Darr as owners of the property. While they testified that the home was purchased for Mr. Herman, the home was still titled in the Darrs' name at Mr. Herman's death. Mr. Herman terminated Ms. Darr's power of attorney the day after she provided him with a copy of the contract of the home purchase.
The circuit court stated that the legal and medical factors-together with the "questionable credibility" of the Darrs' testimony regarding the will, the unexplained selection of Ms. Darr as the sole beneficiary, and the flurry of financial activity involving Mr. Herman's funds and assets-were all consistent with, and supportive of, Ms. Billeaudeau's allegations of undue influence and lack of testamentary capacity. The court found that Ms. Darr failed to meet her burden to rebut these presumptions beyond a reasonable doubt. Our review of the record does not convince us that the circuit court's determination is clearly erroneous, that the circuit court relied on an incorrect burden of proof, or that it applied a "subjective interpretation" of the facts and law in this matter.
II. Exclusion of Audiotape of Execution of Will
Ms. Darr also contends that the circuit court abused its discretion in excluding the audiotape of the execution of the will, the vast majority of which consists of Mr. Darr reading the will aloud. Circuit courts are accorded wide discretion in evidentiary rulings, which we will not reverse absent a manifest abuse of that discretion. Primerica Life Ins. Co. v. Watson , 362 Ark. 54, 59, 207 S.W.3d 443, 447 (2004). Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration.
*468 Schwyhart v. J.B. Hunt, LLC , 2014 Ark. App. 324, at 10, 436 S.W.3d 173, 179. Additionally, we will not reverse a circuit court's ruling on the admission or rejection of evidence absent a showing of prejudice. Id. We also note that an evidentiary error is harmless if the same or similar evidence is otherwise introduced at the trial. Eft v. Rogers , 2012 Ark. App. 632, at 9, 425 S.W.3d 1, 6.
In this case, Ms. Darr argued to the circuit court and argues to us that the audiotape was admissible under the hearsay exceptions set forth in Arkansas Rules of Evidence 803(3)[2] and 804(b)(5).[3] She argues that the tape demonstrates Mr. Herman's mental acuity and demonstrates that he had the testamentary capacity to execute the will. She cites a case in which videotaped evidence of the execution of a will was relied on by the court. See Noland , 330 Ark. 660, 956 S.W.2d 173. The circuit court found the hearsay exceptions inapplicable to the audiotape. Rather, the court thought the exceptions applied to dying declarations when there was impending death, and it excluded the tape.
We hold that the circuit court did not abuse its discretion in excluding the audiotape. First, Noland is not persuasive: it concerned a videotape, not an audiotape, and the opinion did not concern a challenge to the introduction of the evidence, as it did here. Moreover, here, the circuit court actually reviewed the proffered transcript of the audiotape and recognized that Mr. Herman was "responsive and alert in general" but found this did not rebut the presumptions beyond a reasonable doubt. Finally, both of the witnesses to the will and the notary testified that Mr. Herman was alert, asked questions, knew that he was executing a will, and knew to whom he wanted to give his property. Thus, not only did the court actually review the evidence, it was cumulative, and Ms. Darr has failed to show she was prejudiced by its exclusion.
Affirmed.
Harrison and Glover, JJ., agree.

Ms. Spencer also notarized the durable power of attorney signed by Mr. Herman.

803(3) Then Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

804(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
...
(5) Other Exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (i) the statement is offered as evidence of a material fact; (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statements into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.