Cite as 2015 Ark. App. 279

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-14-229

| | |
|---|---|
| | **Opinion Delivered** APRIL 29, 2015 |
| MARCIA JANE SHEPHERD<br>APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, TWELVETH DIVISION<br>[NO. 60PR-2011-1304] |
| V. | |
| JAMES JONES<br>APPELLEE | HONORABLE ALICE S. GRAY, JUDGE |
| | AFFIRMED |

## DAVID M. GLOVER, Judge

John H. Jones died in hospice care at the age of sixty-six on July 17, 2011. Two days before his death, he executed a power of attorney and last will and testament. The will bequeathed John's personal and household effects to his half-sister, appellant Marcia Jane "Janey" Shepherd; $5,000 each to siblings James Taylor Jones (appellee), Elizabeth Allison, and Virginia Crawford; $15,000 each to siblings Eugene Jones and James E. Jones, Jr.; $5,000 to St. Luke's Methodist Church; and left the remainder of his estate to Janey and to Madge Helm, a friend, in equal shares. The value of John's estate totaled over $415,000, including more than $118,000 in savings bonds and over $114,000 from two joint accounts he had held with his aunt, Eula Ruth Harrison, who predeceased him by four days.

On July 21, 2011, Arvest Trust Company (Arvest) petitioned to probate John's will and for appointment to administer John's estate. An order admitting the will to probate and

appointing Arvest as personal representative of the estate was filed on July 22, 2011. A notice of contest of John's will was filed by James Taylor Jones on October 28, 2011. After a hearing on the matter, the Pulaski County Circuit Court found that John's will should be denied admission to probate. The trial court set aside and vacated that part of the July 22, 2011 order admitting the will to probate, finding that the will was not properly executed by John, that John lacked testamentary capacity at the time his will was executed, and that the will was procured by undue influence by Madge Helm and Janey Shepherd. The trial court further found that a confidential relationship existed between John, Madge, and Janey. Janey now appeals, arguing that the trial court erred in finding that the will was not properly executed, that John did not have the testamentary capacity to execute the will, and that the will was procured by undue influence by Madge and Janey. We affirm.

*The Hearing*

At the hearing to contest the will's admission to probate, the following facts were established by testimony. John had three siblings from his father's second marriage—James Taylor Jones, Eugene Jones, and Virginia Crawford—and three half-siblings from his father's third marriage—Janey, Elizabeth Allison, and James E. Jones, Jr. John also had an aunt, Eula Ruth Harrison (Aunt Sissy), with whom he had lived since he was nineteen.

In 2009, Becky Parcher, a trust administrator for Arvest, met with Eula Ruth for the purpose of estate planning; when John expressed an interest in estate planning during that meeting, Eula Ruth put off that discussion, and no estate planning was done on behalf of John at that time. However, Eula Ruth, using attorney Lori Holzwarth, drafted a trust for some

SLIP OPINION

of her assets, which provided that, upon her death, eighty-two percent of the trust assets would be placed in another trust for John's benefit during his lifetime. Eula Ruth predeceased John, passing away on July 13, 2011. Parcher notified Holzwarth of Eula Ruth's death on July 14, 2011; during that conversation, Parcher mentioned to Holzwarth that John had been interested in having some estate planning done in 2009 but that he was currently in hospice care. Before being placed in hospice care on July 8, 2011, John had been in St. Vincent's Hospital in June 2011 with diagnoses of atrial fibrillation, pulmonary embolism, pulmonary fibrosis, aortic aneurysm, pneumonia, and depression; he was discharged from the hospital and briefly stayed with Janey at her home before being readmitted to St. Vincent's. John was never told that he was in hospice or that Eula Ruth had died. Holzwarth met with John at hospice on July 14, 2011; Janey and Madge were present at that meeting. Holzwarth returned to hospice on July 15, 2011, with a will for John to sign and a durable power of attorney in favor of both Janey and Madge. Both documents were signed that day. John died on July 17, 2011.

Various people testified at the hearing as follows. Larry Jones, John's nephew, testified that family meant a lot to John, but he had different relationships with his siblings and with Eula Ruth; John had lived with Eula Ruth since he was nineteen; John was smart but had some quirks and was a little slow; Eula Ruth took care of John and was like a second mother to him; and the two were inseparable. Larry stated that Eula Ruth needed some help with things such as shopping and going to appointments, but that while John was appreciative of Eula Ruth's friend, Madge, for helping Eula Ruth when she needed it, he did not like how

3

involved Madge was in his and Eula Ruth's "personal life and business," specifically their finances.

Larry further testified that he visited John in hospice care on July 15, 2011, and there was a sign on John's door instructing visitors not to tell John that he was in hospice. Larry, who had been a combat medic in the military for twenty years and had served three combat tours, said that he was shocked when he saw John because he looked bad. Larry stated that John was not aware of what was going on around him, his eyes were closed and his mouth was open, he had very labored breathing and would stop breathing for up to fifteen seconds at a time, he was not conscious, and he was not aware that he (Larry) was in the room with him. Larry stated that he knew John was "at the end."

Larry testified he was present when Holzwarth arrived at John's room on July 15, 2011; when she arrived, John was on his back with his eyes closed and his mouth open. He said Holzwarth introduced herself to him as John's attorney and stated she had a power of attorney and a will for John to sign; she made everyone leave the room except Larry and two other people; and she began explaining the documents to John and telling him that he needed to sign them. Larry said that he asked what medications John was taking, and the nurse told him morphine and an anti-anxiety medication. Larry testified he took John's hand and asked him if he wanted to sign, but that John's hand was limp and John did not say anything to him. Larry stated that when he got no response from John, he placed his hand on top of John's hand and wrote John's name on both the power of attorney and the will. According to Larry, John was unable to sign his name, John did not request that Larry sign for him, and he (Larry)

4

also had to sign the documents himself as a witness to John's mark, stating that he helped John sign because John was unable to do so himself. Larry said that he signed because he thought he was helping John. Larry further testified that John did not know that Eula Ruth had died at the time the will was executed.

Holzwarth testified that when Becky Parcher called to let her know that Eula Ruth had died, she told Parcher that John had never called for an appointment, so a will had never been prepared for him; she told Parcher she would call hospice and see if John wanted her to come see him. Holzwarth said she initially was told that John was not able to talk to her, but an hour later she received a call that John wanted to talk to her. Holzwarth said that when she arrived at hospice on July 14, 2011, Janey and Madge were in John's room, and that Janey specifically asked her not to tell John that Eula Ruth was deceased. Holzwarth said that she introduced herself to John as Eula Ruth's attorney and told him that Parcher had told her that he wanted to discuss a will. Holzwarth testified that she asked Madge and Janey to leave the room so she could talk to John, but John was unable to give her more than one- or two-word answers, and when she asked about what he wanted to do in his will, he told her that Madge knew what he wanted. Holzwarth said she asked John if he wanted Madge to come in and tell her how he wanted his estate handled, and he told her yes. Holzwarth testified that, from the beginning, John stated that Eula Ruth was to get everything. She asked John that, if Eula Ruth passed away first, what did he want done then, and it was at that time that Madge recited the specific bequests to his siblings and to the church; then Madge said John wanted her to have half of what was left. Holzwarth said John confirmed the statement. She testified

5

that as far as she knew, John did not know that Eula Ruth had died. Holzwarth further stated that John never mentioned to her the amount of property he had, and she had to prompt him regarding his assets.

Holzwarth stated that she returned with the documents on July 15, 2011, but John was asleep when she arrived; she returned an hour later, but it was her opinion that he was still not awake enough to sign the documents. Holzwarth stated she returned for a third time later that afternoon, at which time the documents were signed. Holzwarth said she prepared the will as if John was going to sign by mark, and she asked Larry Jones if he would help John sign a mark, to which Larry agreed without objection. Holzwarth testified that she told John this was his last will and testament; she read off his siblings' names; and she went through the disposition of the will, including that the remainder of his estate, after bequests and debts, would be split equally by Janey and Madge. She testified that John told her that he wanted the witnesses to witness his signature and that it looked to her as if he signed his own name. She also stated that at the time John signed his will, he thought Eula Ruth was alive, so he would not know that he owned the joint accounts outright.

Parcher testified that the only action she took was to call Holzwarth to notify her that Eula Ruth had passed away, and when Holzwarth mentioned that they had never done any estate planning for John, she let Holzwarth know that John was in hospice. Parcher said part of John's estate was in Series EE savings bonds; Eula Ruth had asked that the bonds be removed from the house; and Madge had brought the bonds to her in a paper bag. Parcher stated she had never talked to John about any disposition he desired in his will.

Madge testified she and Eula Ruth had been friends for twenty-five or thirty years; John told people that she was the big sister he never had and always wanted; John had a lot of confidence in her; John wanted her to tell Holzwarth what he wanted in his will because they had discussed it prior to John entering hospice; they had never discussed the property John owned and she had no idea what John owned when he died; she and Janey were there when Holzwarth came to see John on July 14; to her knowledge, John did not know that Eula Ruth had died at that time and she had not told him; when Holzwarth was told what John wanted in his will only she, Holzwarth, and John were in the room; she was not in the room when the will was executed; she signed documents for John when he went into hospice and at St. Vincent's, even though she did not have a healthcare power of attorney; she also signed a Do Not Resuscitate order at St. Vincent's on John's behalf; and the institutions allowed her to sign because John did not want to do so. Madge said she cooked and went grocery shopping for John and did whatever else John wanted her to do. She disputed the testimony that John did not trust her.

James Jones, Jr., testified that John appreciated the relationship Madge had with Eula Ruth because Madge helped them out; but John had also remarked that Madge spent a lot of time at their house and was always on the computer in Eula Ruth's room, and she would not buy the groceries he liked, which made him mad. It was James's opinion that the will did not seem like his brother's wishes because John thought highly of his brothers and sisters; James was surprised that Madge was getting almost half of John's estate.

James Taylor Jones testified that he and John were not close but that he was able to visit John on the last day of his life when he came home for Eula Ruth's funeral. James stated it alarmed him that John had not been told that he was in hospice or that Eula Ruth had died. James stated that if John's will had been written when John believed Eula Ruth was alive, all of his estate would have gone to her.

Janey testified she signed documents both at St. Vincent's and at hospice because John had asked her to sign whatever needed to be signed. She stated it was her opinion the will represented John's wishes, and Madge relayed what John wanted in his will because he was unable to talk in his condition. Janey said Madge and John were friends, and John told many people how thankful he was to have Madge to help with errands. Janey said her relationship with John was closer than with her other siblings; the way John's will was "laid out" was not surprising to anyone in her family, although they said it was; she did not know how much property John had when he died; and she did not know if John knew how much he had at the time of his death.

Jennifer Hein, a social worker for hospice home care, testified she witnessed John execute his will. Reading from her notes from July 14, 2011, Hein stated that John shook his head that he wanted his will to be witnessed and he appeared to be understanding what the attorney was saying to him. Hein stated she had no recollection of the signing of the will or Larry helping John to sign other than what was in her notes. Hein stated she would not have witnessed it if she believed John had no understanding of what was happening.

SLIP OPINION

However, Hein stated she did not look at the entire will, she did not recall the content of the will, she did not know if the entire will was read, and she did not read the entire will herself.

Dr. Henry Simmons testified that he reviewed the medical records and concluded that the amount of morphine and Ativan John was receiving were therapeutic amounts, and John's heart and respiratory rates were good on July 15, as were his blood pressure and oxygen saturation. He stated John was anxious but in no apparent distress. Dr. Simmons stated John was not continuously depressed or sluggish due to a buildup of drugs in his system. It was Dr. Simmons's opinion that from a medical standpoint, John was alert and awake and well oxygenated on both July 14 and 15. He stated it was not uncommon for a patient with end-stage lung disease to answer questions with single words. Dr. Simmons said it was clear from the medical records that John was quite a bit sicker by July 16, the day before he died.

*Standard of Review*

We review probate matters de novo but will not reverse the probate court's findings of fact unless they are clearly erroneous. *In the Matter of the Estate of Kemp v. First Nat'l Bank & Trust*, 2014 Ark. App. 160, 433 S.W.3d 911. A finding is clearly erroneous when, although there is evidence to support it, the appellate court is left on the entire evidence with the firm conviction that a mistake has been committed. *Id.* We must also defer to the superior position of the lower court sitting in a probate matter to weigh the credibility of the witnesses. *Id.*

9

SLIP OPINION

*Testamentary Capacity & Undue Influence*

Janey contends that the trial court erred in finding that John did not have the testamentary capacity to execute his will and in finding that the will was a product of undue influence. The questions of mental competency and undue influence are so closely related and interwoven that we consider them together. *Sullivant v. Sullivant*, 236 Ark. 95, 364 S.W.2d 665 (1963). In a case where the mind of the testator is strong and alert, the facts constituting undue influence would be required to be far stronger than a case in which the mind of the testator was impaired, such as by disease or advancing age. *Short v. Stephenson*, 238 Ark. 1048, 386 S.W.2d 501 (1965). Testamentary capacity means that the testator must be able to retain in his mind, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and relations of those entitled to his bounty. *Id.* The relevant inquiry is not the mental capacity of the testator before or after a challenged will is signed, but rather the level of capacity at the time the will was signed. *Pyle v. Sayers*, 344 Ark. 354, 39 S.W.3d 774 (2001). Undue influence is defined as "not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property." *Short*, 238 Ark. at 1049, 386 S.W.2d at 501 (citing *McCulloch v. Campbell*, 49 Ark. 367, 5 S.W. 590 (1887)). Undue influence may be inferred from the facts and circumstances of a case, and cases involving questions of undue influence will frequently depend on a determination of witness credibility. *Simpson v. Simpson*, 2014 Ark. App. 80, 432 S.W.3d 66.

With regard to testamentary capacity and undue influence, the trial court found as follows:

> 30. The information regarding the distributions that were set forth in Decedent's will was provided to Lori Holzwarth by Madge Helm. Further, a confidential relationship existed between Madge Helm, Marcia Jane Shepherd, and Decedent as evidenced by the fact that Helm and Shepherd signed documents on behalf of Decedent at the time of his admission to Hospice Home Care and, later, acquired power of attorney over Decedent simultaneously to the execution of Decedent's will. The Court therefore finds that the proffered will was procured by Madge Helm and Marcia Jane Shepherd.

> 31. Decedent, at the time of the making and execution of the proffered will, lacked the requisite testamentary capacity to make and execute a valid will. Decedent was in hospice care, severely ill, and regularly medicated on morphine when attorney Holzwarth contacted him, unsolicited, regarding making a will. Madge Helm described to attorney Holzwarth how Decedent's property should be devised in the will, and attorney Holzwarth followed those instructions. Helm, attorney Holzwarth, and Marcia Jane Shepherd did not tell Decedent that Eula Ruth Harrison had already died, even though all three were aware at the time the proffered will was executed that Harrison was dead. None of these individuals, and notably Holzwarth—the attorney who was drafting the will and who owed a fiduciary duty to Decedent—told Decedent about the effect Harrison's death would have on his own estate. The three individuals did not simply fail to tell Decedent he was in hospice care or that his aunt had already died. They all made conscious decisions to withhold this information from him. Decedent was unable to speak and could barely communicate with those around him, if at all. He was wholly unable to sign his own name without substantial assistance. Attorney Holzwarth had to prompt from Decedent information regarding his property. It is clear that Decedent lacked the ability, at the time of the making and execution of the proffered will, to retain in his memory, without prompting, the nature and extent of his property or to comprehend how he was disposing of his property.

A party challenging the validity of a will must usually prove by a preponderance of the evidence that the testator lacked the requisite mental capacity or that the testator was the victim of undue influence when the will was executed; however, there are certain circumstances that will cause the burden to shift to the proponent of the will to disprove undue influence. *Simpson*, *supra*. One of those circumstances is when a beneficiary procures

the will. *Id.* Procurement of a will requires the actual drafting of the will for the testator or planning the testator's will and causing him to execute it. *Id.* Procurement shifts the burden to the proponent of the will to show beyond a reasonable doubt that the will was not the result of undue influence and that the testator had the mental capacity to make the will. *Id.* Whether a will was procured by undue influence is a question of fact for the trier of fact. *Medlock v. Mitchell*, 95 Ark. App. 132, 234 S.W.3d 901 (2006). The existence of a confidential relationship between a primary beneficiary and a testator also gives rise to a rebuttable presumption of undue influence. *Simpson, supra.* Whether two individuals have a confidential relationship is a question of fact. *Medlock, supra.* A confidential relationship arises between a person who holds power of attorney and the grantor of that power. *Id.*

With respect to John's testamentary capacity, Janey's argument attacks the credibility determinations made by the trial court. Janey argues that James Taylor Jones offered "no credible evaluation" of John at the time of the execution of the will and "therefore failed to meet his burden on this issue." However, this ignores Larry Jones's testimony that John was not conscious and was unaware of what was happening at the time of the execution of the will; that John did not respond to attorney Holzwarth when she asked if he wanted to sign his will; that John did not say anything to Larry when Larry asked if he wanted to sign the will; and that John could not take an active part in signing his name to the will. According to Larry, John was unable to retain in his mind, without prompting, the extent and condition of his property or to comprehend to whom he was giving it. Furthermore, John was never told that Eula Ruth had passed away and that the joint accounts he held with her now

12

SLIP OPINION

belonged solely to him and would be part of his estate, nor was there any evidence that John had any idea of the value of his savings bonds; in fact, Janey's own testimony indicated that she did not know if John even knew the extent of his property, thus bolstering the fact that John was unaware of the extent of his estate. On this evidence, we cannot say that the trial court's finding that John did not have the testamentary capacity to execute his will is clearly erroneous.

Janey does not specifically contest the trial court's findings that she and Madge procured the will and that both she and Madge were in confidential relationships with John. Rather, she argues that there was no testimony that Madge used coercion, fear, or any other abuse to elicit the terms of John's will and circumvent John's free will to dispose of his property as he desired. We cannot agree. John was in hospice care, a fact of which he was unaware per Janey and Madge's instructions; he was medicated on morphine; he was not told that Eula Ruth had passed away, again per Janey and Madge's instructions; Madge signed a Do Not Resuscitate order while John was a patient at St. Vincent's Hospital in June 2011, despite the fact that she did not have power of attorney and was not authorized to do so; Janey and Madge signed documents for John on July 8, 2011, when he entered hospice, despite the fact that neither had power of attorney; and Madge was present during the discussion of John's will and in fact was the person who instructed attorney Holzwarth as to the terms of the will that Madge said John desired. Given this evidence, we cannot say that the trial court's finding of a presumption of undue influence, and the failure to rebut such a presumption, is clearly erroneous.

Because we affirm the trial court's findings that John did not have the testamentary capacity to execute his will and that the will was a product of undue influence, it is unnecessary to address Janey's argument that the will was not properly executed.

Affirmed.

KINARD and HIXSON, JJ., agree.

*Kimberly Eden*, for appellant.

*Richard F. Hatfield, P.A.*, by: *Richard F. Hatfield*, for appellee.