

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV–15–643

RICHARD ROBINSON

APPELLANT

V.

ESTATE OF HARRY ROBINSON, SR., DECEASED, AND BENNE ROBINSON

APPELLEES

**OPINION DELIVERED** MARCH 2, 2016

APPEAL FROM THE CROSS COUNTY CIRCUIT COURT, [NO. 19-PR-2013-26]

HONORABLE BENTLEY E. STORY, JUDGE

AFFIRMED

## ROBERT J. GLADWIN, Chief Judge

Appellant Richard Robinson appeals the order entered on December 29, 2014, by the Cross County Circuit Court. He argues that the circuit court erred in declining to set aside the May 17, 2011 will (Will) of his father based on findings that his stepmother, appellee Benne Robinson, met her burden of proving beyond a reasonable doubt that his father possessed mental capacity, testamentary capacity, and competency to make and execute the Will and that she also met her burden of proving beyond a reasonable doubt that she did not procure the will through undue influence. We affirm.

### I. *Facts*

Harry Robinson, Sr. (Decedent), died on January 10, 2013, at age eighty-six. He had suffered for several years from Parkinson's disease and various other illnesses, including dementia. Decedent was predeceased by his first wife, Jean Robinson, who died in 1995. They had three sons together. Richard is the only living child of Decedent. The youngest

son, Lee, died several years prior to Decedent's death. The oldest son, Harry, Jr., known as Rudy, died on May 11, 2011. Decedent had been a farmer most of his life, and prior to Rudy's death, Decedent and Rudy had been engaged in a farming partnership. Neither Lee nor Rudy had children surviving them.

Decedent was also survived by his second wife, appellee Benne Robinson (Benne). Decedent married Benne in 1998 when he was seventy-two years old and she was forty-nine years old. The couple had been involved in an ongoing affair since Benne was around twenty years old. Decedent and Benne did not have any children together.

In October 2006, while Decedent was still able to drive, he scheduled an appointment with his attorney, Mr. Danny Glover, and his two living sons, Rudy and Richard, were present for that meeting. At that time, Decedent instructed Mr. Glover to prepare a will, which provided for Benne to have their home and approximately twenty acres and a one-half interest in cattle, and the remainder of the property was to go to his two sons.

Benne learned of the 2006 will and its contents sometime in 2010, subsequent to which she scheduled an appointment for Decedent to go to Mr. Glover's office and execute a new will, dated October 6, 2010, and a limited durable power of attorney. That will set out Decedent's plan to sell 680 acres of farmland, leaving $300,000 to Rudy, $200,000 to Richard, and the remainder to Benne.

In February 2011, Benne made an appointment for Decedent and took him to Mr. Glover's office to execute a codicil to the 2010 will, which stated he was selling the property

under contract, with ten annual payments of $40,000 to be paid to him, or if he died, to Benne, and when the final balloon payment was made, Rudy was to receive $300,000, Richard $200,000, and the remainder to Benne.

When his brother Rudy died on May 11, 2011, Richard did not immediately go to Decedent but rather went to see Rudy's wife, Linda, with whom both Decedent and Benne had a strained relationship. When Richard did go to Decedent's home shortly after Rudy's death, he told Benne that she was not welcome at Rudy's visitation or funeral. Mr. Glover testified that Decedent told him that he (Decedent) was present when Richard said this. Decedent's caretaker, Rebecca Dixon, was also present.

On May 17, 2011, Benne took Decedent to Mr. Glover's office for a conference because Decedent wanted to make a new will. The witnesses to the execution of the Will, Casey Shaw and Paula Stroud, and notary, Cathey Haire, each testified that Decedent was acting under his own free will and no undue influence when he signed the Will. Mr. Glover also testified that Decedent was not acting under any undue influence when he signed the 2011 Will. Mr. Glover wrote a memo on May 19, 2011, wherein he related circumstances concerning his meeting with Decedent outside the presence of Benne prior to execution of the Will on May 17, 2011. There was no proof that Benne told Decedent to make a new will, that Benne drafted the Will, or that she delivered any notes to Mr. Glover concerning the 2011 Will.

The Will was admitted to probate on February 20, 2013, after Decedent's death. Under the terms of the Will admitted to probate, Benne was the sole beneficiary. On May

3

1, 2013, Richard filed a petition to set aside the will and a will contest, whereby he alleged that (1) the Will was executed under the undue influence and/or duress of Benne; (2) Decedent was not of sound mind and disposing memory and was mentally incapacitated at the time; (3) the Will was procured by Benne; and (4) Decedent was not competent to sign, in that the Will fails to mention the natural bounties of Decedent's affections. Benne denied all allegations.

At trial, the circuit court ruled that Richard proved procurement of the Will and that the burden of proof shifted to Benne. In the circuit court's final order, the circuit court explained that Benne had the burden to prove beyond a reasonable doubt (1) that Decedent possessed testamentary capacity to make and execute the 2011 Will, and (2) that Decedent made the Will without undue influence from Benne. The circuit court then specifically found that Benne met her burden of proving beyond a reasonable doubt that Decedent possessed mental capacity, testamentary capacity, and competency to make and execute the 2011 Will, and that Benne met her burden of proving beyond a reasonable doubt that she did not procure the 2011 Will through undue influence. The circuit court denied Richard's petition in its order entered on December 29, 2014. Richard filed a timely notice of appeal on January 26, 2015.

II. *Standard of Review & Applicable Law*

We review probate matters de novo but will not reverse the circuit court's findings of fact unless they are clearly erroneous. *Shepherd v. Jones*, 2015 Ark. App. 279, 461 S.W.3d 351. A finding is clearly erroneous when, although there is evidence to support it, the

appellate court is left on the entire evidence with the firm conviction that a mistake has

been committed. *Id*. We must also defer to the superior position of the lower court sitting

in a probate matter to weigh the credibility of the witnesses. *Id*. This court reiterated in

*Shepherd* that

> [a] party challenging the validity of a will must usually prove by a preponderance of
> the evidence that the testator lacked the requisite mental capacity or that the testator
> was the victim of undue influence when the will was executed; however, there are
> certain circumstances that will cause the burden to shift to the proponent of the will
> to disprove undue influence. One of those circumstances is when a beneficiary
> procures the will. Procurement of a will requires the actual drafting of the will for
> the testator or planning the testator's will and causing him to execute it. Procurement
> shifts the burden to the proponent of the will to show beyond a reasonable doubt
> that the will was not the result of undue influence and that the testator had the mental
> capacity to make the will. Whether a will was procured by undue influence is a
> question of fact for the trier of fact. The existence of a confidential relationship
> between a primary beneficiary and a testator also gives rise to a rebuttable
> presumption of undue influence. Whether two individuals have a confidential
> relationship is a question of fact. A confidential relationship arises between a person
> who holds power of attorney and the grantor of that power.

*Id*. at 11–12, 461 S.W.3d at 358 (internal citations omitted.)  While the appellate court's

review in a will contest must take into consideration that the will's proponent bore the

burden of proof, or the burden of going forward with the evidence beyond a reasonable

doubt, the question on appeal is not whether the appellatae court has such a doubt; rather,

the question on appeal is whether the circuit court's decision was clearly erroneous. *Pyle v.

Sayers*, 344 Ark. 354, 39 S.W.3d 774 (2001).

### III. *Discussion*

Richard argues that Benne failed to meet her burden of proving beyond a reasonable

doubt that his father possessed mental capacity, testamentary capacity, and competency to

make and execute the will and also that she did not procure the will through undue

influence. In *Shepherd*, *supra*, we reiterated as follows:

> The questions of mental competency and undue influence are so closely related and interwoven that we consider them together. In a case where the mind of the testator is strong and alert, the facts constituting undue influence would be required to be far stronger than a case in which the mind of the testator was impaired, such as by disease or advancing age. Testamentary capacity means that the testator must be able to retain in his mind, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and relations of those entitled to his bounty. The relevant inquiry is not the mental capacity of the testator before or after a challenged will is signed, but rather the level of capacity at the time the will was signed. Undue influence is defined as "not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property." Undue influence may be inferred from the facts and circumstances of a case, and cases involving questions of undue influence will frequently depend on a determination of witness credibility.

*Shepherd*, 2015 Ark. App. 279, at 10, 461 S.W.3d at 357 (internal citations omitted).

The circuit court stated as follows in paragraph 30 of its forty-eight page opinion:

> [Richard] asserts that Mr. Glover confirmed that there were no discussions with [Decedent] about the alienation of [Richard], about the nature of the claims of [Richard], and [Decedent]'s knowledge of the natural objects of his bounty, etc., and that Mr. Glover never discussed alternatives to protect [Richard] from being disinherited. First, it is the court's recollection of the testimony that Mr. Glover did discuss with [Decedent] this alienation of [Richard]. Second, they did discuss the nature of [Richard]'s claim and [Decedent] told Mr. Glover that he did not want [Richard] to receive any inheritance unless Benne predeceased [Decedent] because of the way [Richard] treated Benne and the way [Richard] treated him. Third, they discussed [Decedent]'s knowledge of the natural objects of his bounty when [Decedent] told Mr. Glover that he did not want [Richard] to receive any inheritance except as stated above. Fourth, Mr. Glover is not required to discuss alternatives to protect [Richard] from being disinherited. Mr. Glover is obligated to discuss with [Decedent] those elements set forth above; however, it is not his obligation to convince [Decedent] to not disinherit [Richard]. At one point in [Richard]'s argument he asserts that [Decedent] did not mention his other sons. He is not required to mention his other sons given the fact that they predeceased him and left no heirs.

6

The circuit court considered Decedent's medical records and testimony of the witnesses, and in its opinion, stated,

25. [Richard] offered medical records as proof that [Decedent] had suffered from dementia for a long period of time and that he was suffering from dementia when he executed the 2011 will. [Richard]'s Exhibit No. 1 begins with the hospitalization of [Decedent] on March 6, 2010. A "history of dementia" was mentioned in the History & Physical Report on March 16, 2010. Confusion was added by March 26th to the History & Physical Report. Dr. Cathey testified that he thought [Decedent] suffered from dementia and was not competent at the time of the March, 2010, hospitalization. Dr. Cathey did not see or treat [Decedent] after the March, 2010, hospitalization. Ms. Lisa Stutts, a clinician, performed a Fall Risk Assessment on [Decedent] on April 7, 2011, at which time she found depression, impaired judgment, impaired memory, and impaired decision making. Ms. Stutts testified on cross examination that she does not know if [Decedent] had impaired judgment or impaired decision-making capabilities on April 7th or not. She testified that if a doctor writes on a chart a diagnosis of dementia, she writes it down as well in subsequent reports. Memory loss on April 7th was not determined by her. The diagnosis of "cognitive deficit" was not based on her discussions with [Decedent]. [Richard]'s Exhibit No. 1 also captures diagnosis by Dr. Willard Burks who was [Decedent]'s primary physician. His diagnosis was of confusion and dementia during the March, 2010, hospitalization. He also found Parkinson's with dementia in March of 2011. Other medical providers also mentioned varying assessments of dementia or cognitive impairment. Ms. Stutts did another Fall Risk Assessment on May 20, 2011, and again opined depression, impaired judgment, impaired memory, and impaired decision making. However, as stated before, she often placed in the assessment that which had already been concluded by someone else. The May 20, 2011, Fall Risk Assessment was three days after Rudy was buried and one day after Dr. Burks had found [Decedent] to be competent and able to conduct his own business. Ms. Stutts's assessment was part of a routine visit. Dr. Burks's assessment was based on a clearly defined purpose, that being to determine [Decedent]'s competency.

The circuit court heard other testimony from Richard's witnesses Desmond Murphy (Decedent's friend), Stanley Harrison (Decedent's cousin), and Linda Robinson (Rudy's widow). These witnesses testified about Decedent's failing health and mental capacity. None

of these people were present when Decedent executed his Will at the office of Mr. Glover on May 17, 2011.

Benne's witnesses, Kevin Ward and William Ward, were involved in raising horses and cattle. Kevin Ward knew Decedent for many years, relying on him for advice on animal diseases and how to treat them. William Ward was a neighbor who had lived within one-half mile of Decedent for over ten years. Both witnesses testified that Decedent was a "go to guy" on any problems with health issues of livestock. Decedent had such knowledge both before and after making the May 17, 2011 Will.

Dr. Willard Burks, Decedent's primary-care physician, gave Decedent a mental examination to determine his competency on May 19, 2011, two days after the Will in question was executed. Dr. Burks had known Decedent for over forty years as his patient. They both had interests in K-Bar horses and the lineage. Dr. Burks was well aware of Decedent's medical condition and his aging. After examining Decedent and questioning him, Dr. Burks concluded that Decedent was competent on May 19, 2011, to take care of his own business concerns. Again, the operative time would be when the Will was signed on May 17, 2011.

After considering this testimony on the issue of testamentary capacity, the circuit court found, to wit:

> 38. The attesting witnesses and the notary public were consistent in their opinions that [Decedent] was competent on May 17, 2011, to discuss his will, its contents, his wishes and directives, and to execute the will. While the attestation clause does not state that the witnesses found [Decedent] to be of sound and disposing mind and memory, the witnesses and the notary public all stated that he was on May 17th. They testified that Mr. Glover has a routine regarding the execution of wills

and that he followed that routine:  In *Foster v. Foster*, 2010 Ark. App. 594, 377 S.W.3d 497, the Arkansas Court of Appeals stated that complete sanity in a medical sense at all times is not essential to testamentary capacity, provided that capacity exists at the time the will is executed and that it is executed during a lucid interval. Every person, who was present during [Decedent]'s execution of the 2011 will, testified that he was competent at that moment to sign his will. In *Foster*, the Arkansas Court of Appeals also stated:

> . . . Evidence of the testatrix's mental condition, both before and after execution of the will at issue, is relevant to show her mental condition at the time she executed the will. *Id*. The test is whether, at the time the will was executed, the testatrix has a fair comprehension of the nature and extent of her property and to whom she was giving it. *Id*.

[Richard] offered medical evidence of [Decedent's] mental capacity before and after the execution of the 2011 will and the court has considered this evidence. However, this court concludes that this evidence is not persuasive; the evidence most persuasive came from Dr. Willard Burks, [Decedent's] personal physician for many years who knew him well. Dr. Burks was well familiar with [Decedent's] physical and mental condition. Dr. Burks testified that two days after the 2011 will was executed [Decedent] was competent to handle his own affairs. No evidence was presented that [Decedent] suffered from dementia on the day the 2011 will was executed. Just the opposite evidence was presented. Mr. Glover, the two (2) attesting witnesses, and the notary public all testified that they were satisfied that [Decedent] was competent on the day the 2011 will was executed.

39. [Decedent] and Benne were married for many years; she took care of him especially during the later years of his life. She had a confidential relationship with him as his spouse and care giver of many years. Hence, the burden of proof shifted to her to prove beyond a reasonable doubt that [Decedent] had the testamentary capacity to make and execute a new will.

40. Based on the above, this court finds and concludes that on May 17, 2011, [Decedent] possessed the mental capacity, testamentary capacity, and competency to discuss with Mr. Glover his desires and directives for the disposition of his estate and that he executed the will while possessing that competency. Whether [Decedent] was of sound and disposing mind and memory on any other day except May 17th is not as important and dispositive as his mental capacity on May 17th. Dr. Willard Burks's testimony along with the lay testimony of the witnesses called by [Benne], convinces this court that [Decedent] was competent to execute his will on May 17th and that provisions found in his will are his wishes, desires, and directives. [Richard's] petition is denied based on the assertion of lack of testamentary capacity. This court

finds that [Benne] met her burden of proving beyond a reasonable doubt that [Decedent] possessed the mental capacity, testamentary capacity, and competency to make and execute the 2011 will.

Procurement shifts the burden to the proponent of the will to show beyond a reasonable doubt that the will was not the result of undue influence and that the testator had the mental capacity to make the will. The existence of a confidential relationship between a primary beneficiary and a testator gives rise to a rebuttable presumption of undue influence. *Simpson v. Simpson*, 2014 Ark. App. 80, 432 S.W.3d 66. Direct and circumstantial evidence, such as the nature of the relations and dealings between the testator and the beneficiaries, the extent of the property of the testator, his family connections, the claims of particular persons upon his bounty, the situation and mental condition of the testator, the nature and contents of the will itself and the circumstances surrounding its execution are facts from which fraud and undue influence may be inferred. *Id.*

After considering the evidence and testimony of witnesses, the circuit court found as follows on the issue of undue influence, to wit:

49. This court finds that [Decedent]'s will was not executed under the undue influence and/or duress of [Benne]; this court finds that [Decedent] was of sound mind and disposing memory and was not mentally incapacitated at the time of the execution of the 2011 will; this court finds that [Decedent] comprehended the nature, extent, and disposition of his estate; this court finds that the 2011 will was not procured by [Benne]; this court finds that [Decedent] was competent to sign the 2011 will and that the will does mention the natural bounties of [Decedent]'s affections for his sole surviving son, [Richard], by the contingent remainder left to him in the event Benne predeceased [Decedent]; and this court finds that there is no requirement that a will must mention predeceased children in order to be valid.

50. In summation, this court finds and concludes that [Benne] proved beyond a reasonable doubt that she did not procure the 2011 will through undue influence. This court finds and concludes that [Benne] proved beyond a reasonable doubt that

[Decedent] was competent to execute his 2011 will and was of sound mind and disposing memory at that time.

As with Decedent's testamentary capacity, the circuit court heard testimony from multiple witnesses presented by each party and presented a comprehensive analysis of the evidence in its opinion. To reiterate our standard of review, we will reverse a circuit court's findings on the questions of both testamentary and mental capacity and undue influence only if they are clearly erroneous, giving due deference to the superior position of the circuit judge to determine the credibility of the witnesses and the weight to be accorded their testimony. *Harbur v. O'Neal*, 2014 Ark. App. 119, 432 S.W.3d 651; s*ee also Simpson*, *supra*.

From our review of the evidence, it is clear that the circuit court considered all of the testimony and evidence presented and thoroughly analyzed it in the comprehensive forty-eight-page opinion. We hold that the circuit court's findings on these issues were not clearly erroneous. Accordingly, we affirm.

Affirmed.

VIRDEN and GRUBER, JJ., agree.

*Andrea Brock, P.A.*, by: *Andrea Brock*; and *Rita Reed Harris, P.A.*, by: *Rita Harris*, for appellant.

*John D. Bridgforth, P.A.*, by: *John D. Bridgforth*, for appellees.