
# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-16-671

| | | |
|---|---|---|
| | | **Opinion Delivered:** May 31, 2017 |
| KATHY PACE | | |
| | APPELLANT | APPEAL FROM THE LAWRENCE COUNTY CIRCUIT COURT [NO. 38PR-13-57] |
| V. | | |
| CORA STEELE AND ESTATE OF RALPH STEELE, DECEASED | | HONORABLE PHILIP G. SMITH, JUDGE |
| | APPELLEES | |
| | | AFFIRMED |

## BART F. VIRDEN, Judge

Appellant Kathy Pace appeals from the Lawrence County Circuit Court's order admitting Ralph Steele's will to probate. The primary beneficiaries of the will were Ralph's nephew, Darrell Steele, and Darrell's wife, appellee Cora Steele.[1] Pace argues that the trial court erred in not finding procurement of the will by the beneficiaries and in concluding that Ralph had the requisite mental capacity and freedom from undue influence to make the will. We hold that the trial court clearly erred in finding that there was no procurement, but we nevertheless affirm the trial court's decision admitting Ralph's will to probate.[2]

---

[1]Darrell Steele died shortly before trial.

[2]Only part of the trial court's ruling is clearly erroneous. If the trial court reached the right result, we will affirm even if we disagree with the trial court's reasoning. *See Matter of Estate of F.C.*, 321 Ark. 191, 900 S.W.2d 200 (1995).



I. *Overview of Events and Medical Evidence*

Wanda, Ralph Steele's wife of approximately seventy-five years, died in March 2012. Ralph and Wanda had no children, but Ralph had many nieces and nephews, including Darrell and appellant Pace.

In November 2012, Ralph fell and injured his knee. He was taken to the emergency room at St. Bernard's Medical Center (St. Bernard's) and given a knee brace. He then went to HealthSouth Rehabilitation Hospital (HealthSouth). Doctors later determined that Ralph had torn a muscle and needed surgery, which was performed at St. Bernard's on December 5, 2012. After Ralph was discharged, he returned to HealthSouth in mid-December 2012. Ralph then developed pneumonia and was admitted to St. Bernard's on December 23, 2012. When he was discharged on January 2, 2013, he returned to HealthSouth, where he remained until January 19.

On January 7, 2013, during his stay at HealthSouth, Ralph signed a will. Both parties introduced medical records from St. Bernard's, HealthSouth, and the Lawrence County Nursing Center. An "Interdisciplinary Daily Document" at HealthSouth dated January 7, 2013, indicates that Ralph had "mild difficulty with appropriate decision making," and as for his memory, he had "mild difficulty/self corrects." There is also a note on that date indicating that, on a pain-intensity scale from zero to ten, Ralph was experiencing a five.[3] A case-management-progress note dated January 7 indicates that Ralph had complained of

---

[3]Pace asserts that a daily progress report for January 7, 2013, states that at 12:01 p.m., shortly after the will had been signed, pain medication was given to Ralph because he was suffering a ten out of ten on the pain-intensity scale. There is such a note in the addendum, but it is not dated.

"weakness." A bill from HealthSouth shows that Ralph had been given three hydrocodone pain pills on January 6 and three more on January 7. A progress note dated January 9 indicates that Ralph had "some mental status changes that occurred last evening" and that "his niece" had reported that he was better but "still having some confusion."[4]

Ralph was discharged from HealthSouth on January 19, 2013. A document states that he was discharged "in care of his niece" and that Ralph required twenty-four-hour care. Ralph returned home for about a week, with Cora and Darrell taking care of him. He then sought admission to the Lawrence County Nursing Center. A capacity verification signed by Dr. Paul Vellozo and dated January 28, 2013, indicates that Ralph had "waxing and waning capacity and is able to make decisions some of the time." In an admission document dated January 28, Dr. Vellozo circled "no" in response to the question "Dementia diagnosis?" Ralph was admitted to the nursing home on January 29. Ralph did not sign a resident-responsibilities form; instead, Cora signed as the responsible party. Above her signature, the form states that "[i]f the resident is unable due to physical/mental incapacity's [sic] to understand and comprehend the above, the person named as responsible agent shall be required to review and acknowledge the basic rights as stated." At the bottom of the page beside his signature and the date of February 1, 2013, Dr. Vellozo wrote that Ralph was "unable to sign/comprehend due to dementia."

Ralph died on July 21, 2013, at the age of ninety-four. In August 2013, Pace asserted that Ralph had died intestate and nominated herself as administrator of his estate. The trial

---

[4]There is some indication that Cora is the "niece" to which several medical records refer; Cora is also called Ralph's "niece-in-law."

court entered an order to that effect. Soon afterward, Cora and Darrell sought to admit Ralph's will to probate and to set aside Pace's appointment. Cora and Darrell also requested to be appointed executors of Ralph's estate pursuant to the will. Pace asked that Cora and Darrell's petition be denied because she alleged that Ralph's will had been procured by fraud and undue influence.

## II.  *Bench-Trial Testimony*

Dick Jarboe, an attorney who had been practicing law since 1969, testified that he had been contacted by either Cora or Darrell about preparing a will for Ralph. Jarboe first met Ralph at St. Bernard's in December 2012. Jarboe stated that he had gotten the impression that Ralph was close to Cora and Darrell and wanted to make "a significant gift" to them. Jarboe stated that he had left after only ten to fifteen minutes because Ralph had said that he was not ready to prepare the will. Jarboe said that Cora subsequently came to his law office with notes and stated that Ralph wanted to leave all his property to her and Darrell. Jarboe observed that, although there was a signature block for Ralph on Cora's notes, Ralph had not signed it. Despite this, Jarboe did not return to the hospital to visit with Ralph and did not speak with him on the telephone. Instead, he prepared Ralph's will relying on the notes given to him by Cora. Jarboe testified that he did not think it would have been better if he had seen Ralph in person to confirm that Cora's notes accurately represented how Ralph wanted his will prepared. Rather, Jarboe thought that those witnessing the signing of the will would know more about what Ralph wanted done with his property and whether he was competent to sign the will. Jarboe testified that he sent his bill for legal services to Cora.

Lavan Nicholas testified that she had known Ralph for approximately fifty years and that she and her husband had lived near Ralph and Wanda for many years and were very good friends. Lavan was present in the room when Ralph signed the will, and she had read the will to Ralph at Darrell's request. She stated that she had then asked Ralph whether the will was what he wanted and that he had indicated it was and had not asked any questions. She said that Ralph had seemed very alert, had been sitting up in his bed, and had not appeared to be in pain. Lavan further stated that Ralph had recognized her and her husband and had asked about their daughter. She had no reservation saying that Ralph knew and understood what he was doing, and she thought Ralph was aware that he had left other family members out of his will. Lavan testified that she thought Ralph trusted Cora and Darrell completely.

Don Nicholas, Lavan's husband, testified that he had known Ralph all his life. He said that after Darrell's father had died, Darrell had been like a son to Ralph. Don testified that he was not surprised that Ralph had left everything to Cora and Darrell because Ralph had said several years earlier that he wanted Darrell to have everything of his after he died. Don recalled several instances in which Ralph had helped Darrell financially. According to Don, after Wanda died, Cora and Darrell had checked in on Ralph, along with Ralph's nephew Joe Videll and Ralph's niece Patsy Thompson. Don said that he had seen Ralph several days before he signed the will and that Ralph had told him he was making a will and asked him to witness the signing. Don recalled that Ralph had appeared to be paying attention while Lavan read the will. He said that there was nothing about Ralph's appearance, demeanor, speech, or actions to suggest that he was not in his right mind on

the day he signed the will. Don testified that after signing the will, Ralph had said that he wanted Patsy to have $10,000 and had asked him to tell Darrell that. Don stated that, although Ralph had been in and out of the hospital, he was "okay mentally" and had not seemed confused or "out of his mind." Don described Ralph as "fairly easy going" but said that he could not be pushed around and would not be easily persuaded or tricked into doing something.

Bobby Teel testified that he had been friends with Ralph for approximately fifty years. He stated that Cora and Darrell had taken care of Ralph after Wanda died and that they had always been with him when he was at the hospital and in rehab. Teel testified that about a month before Ralph signed the will, he had told him that he was going to leave everything to Cora and Darrell "because all these other vultures had been coming around making appearances and nobody done anything for him but Darrell and Cora Steele." Teel said that Darrell had called him and asked him to witness the signing of Ralph's will and that Darrell had driven him to the hospital that day. He said that Ralph had recognized him and had not appeared confused. Teel said that he did not think there was anything wrong with Ralph's mind on the day he signed the will. Teel testified that he was not surprised that Ralph had left everything to Cora and Darrell and that "nobody was twisting [Ralph's] arm" when he signed the will.

Jun-Yilai, a physical therapist at HealthSouth, testified that Ralph had been her patient and that she had gotten to know him on a personal level. She said that Ralph had spoken about Cora and how she had helped him; that he had told her many times that, if it had not been for Cora, he would be dead; and that he had become very emotional when

speaking about Cora because he appreciated all she had done for him. Jun–Yilai said that Cora was at rehab with Ralph every day or every other day, except when she was sick.

Darrell Steele, who was deposed just prior to his death, testified that Ralph had been like a father to him when his own father passed away. Darrell stated that over the years he had "[run] into some financial trouble" with which Ralph had helped him. Darrell said that in 1996, he bought a house and twenty acres from Ralph for only $65,000 and that, when he had trouble getting a loan, Ralph had said to him that he (Darrell) would end up with everything that he (Ralph) had anyway. Darrell said that he and Cora had seen Ralph every day after "Aunt Wanda" died. They had taken food to him, helped him with housework, paid bills, bought groceries, and taken him to doctors' appointments. Darrell did not know whether other nieces and nephews had helped Ralph but said that it seemed like Ralph had always called him. He said that Ralph had chosen two good friends to witness the signing of the will and that he (Darrell) had contacted them a day or two before the will was to be signed. Darrell conceded that he and Don Nicholas owned a farm together and had "a lot of other business dealings." Darrell stated that neither he nor Cora was in the room when Ralph had signed the will. Darrell said that he did not remember Ralph seeming confused at the hospital or at HealthSouth. Darrell described Ralph as "sharp as a tack" and said that it was "impossible to persuade Uncle Ralph to do something that he [did] not want to do."

Cora Steele testified that Patsy Thompson was around quite a bit when Wanda was alive and had helped Wanda with tasks and that Joe Videll and his brother Bill also had helped Wanda and Ralph. Cora stated that after Wanda died, she had done Ralph's laundry, cooked his meals or taken him out to eat, and set up an automatic draft for some of his bills

and paid the rest out of his account. Cora explained that Wanda had always handled these tasks and that Ralph was "pretty helpless around the house." Cora testified that "[she and Darrell] loved Uncle Ralph and took care of him without hoping to benefit from his estate."

Cora said that Ralph had first brought up the subject of creating a will during a hospitalization in December 2012. Cora said that she and Darrell had used attorney Dick Jarboe to handle other matters for them and had recommended him to Ralph. Cora agreed to make the arrangements for Ralph. She said that Darrell had called Jarboe and asked him to speak with Ralph at the hospital, to which Jarboe agreed. Cora said that Jarboe had not stayed long, and she recalled that Ralph had not felt well that day.

Cora said that, around January 2, 2013, Ralph mentioned the will again and told her that he wanted her and Darrell to have everything of his. She said that she contacted Jarboe and asked him to return to the hospital to speak with Ralph but that Jarboe had said it was unnecessary; he had instructed her to find out what property Ralph had and to compile a list of items with descriptions; and he had also told her that she would need two witnesses to verify Ralph's signature. Cora said she had thought it was strange that Jarboe did not go back to see Ralph but that she had not asked questions.

Cora said that she returned to HealthSouth where Ralph had specified that she and Darrell would get his house and its contents, the shop and its contents, his car, his checking account, and two CDs. She testified that Ralph had told her that all the necessary paperwork could be found in a desk at his house. Cora said that she had gone to Ralph's house, gotten the information, and typed it on her computer. Cora said that she had shown the list to

Ralph and that he had approved it. She said that she had not asked him to sign her notes because they were not legal documents and had been prepared for Jarboe's benefit.

Cora said that, a couple of days after she had given Jarboe the notes, she went to Jarboe's office, picked up the finished will, and took it to the hospital for Ralph to sign. Cora said that Ralph had signed the will with only Lavan and Don Nicholas and Bobby Teel present. She said that, after the will had been signed, they commented that Ralph had been joking and laughing. Cora said that she had taken the signed will to Jarboe the following day but that Jarboe had told her to hold onto it, so she had kept the will in a vault at her home. Cora said that she had paid for preparation of the will from Ralph's account.

Patsy Thompson testified that Ralph was her mother's brother and that, after her mother passed away, Wanda had been a mother figure to her. Patsy conceded that Ralph and Darrell had "a close relationship" and that Cora had formed a relationship with both Ralph and Wanda. Patsy stated that Wanda and Ralph had spent most holidays with her and her family. Patsy said that after Wanda died, she had gone by to see Ralph almost every day. She said that she had taken meals to Ralph, planted and watered flowers, helped him with a garden, assisted him with the washing machine and coffee maker, helped him pay bills and set up an automatic draft for some of his bills, and kept up with and taken him to doctors' appointments. She said that Ralph had called her, a registered nurse, late one night with a bowel impaction and that she had taken him to the hospital and stayed with him—Cora and Darrell were not there. Patsy testified that she was with Ralph when he bought his last car. Patsy saw Ralph "go down" both physically and mentally and recalled that he had become paranoid that someone was trying to take his possessions. She said that she had

visited him at least once at HealthSouth at some point between January 2 and 19 and that he had appeared to be disoriented and confused. Patsy said that Ralph had recognized her but had not been certain where he was. She believed that Ralph could have been manipulated by someone he trusted. Patsy testified that, when she was without transportation for seven weeks, Cora had kept her informed about Ralph's condition. Patsy was with Ralph about an hour before he died at the nursing home. Patsy testified that she was surprised that Ralph had left everything to Cora and Darrell because he and Wanda "did not play favorites."

### III.  *Trial Court's Order*

The trial court entered its order and attached a detailed letter containing its findings. The trial court noted certain undisputed facts regarding the actions of Cora and Darrell, including the following:

> (1) Darrell and Cora engaged the services of Attorney Dick Jarboe to "talk to Ralph about a will"; (2) Mr. Jarboe visited Ralph in the hospital in December 2012, where Cora met Mr. Jarboe and escorted him to Ralph's room; (3) In January 2013, Cora brought notes to Mr. Jarboe purporting to be Ralph's directions for drafting the will; (4) Mr. Jarboe drafted the will according to the notes provided by Cora, gave the draft to her along with instructions about proper execution and witnessing of the will; (5) Cora transported the draft from the attorney to Ralph at the hospital; and (6) Darrell and/or Cora got two of Ralph's long-time friends to witness his execution of the will.

The trial court found that there was no procurement on the part of Cora and Darrell because their actions had been taken solely at Ralph's direction. The court found no credible evidence that Cora or Darrell had coerced or unduly influenced Ralph. Further, the court found that Ralph had been cognizant of his property and fully competent to execute the

will on the day it was signed. The court found "overwhelming evidence" that Ralph had

the requisite mental capacity to sign the will and that he did so without any undue influence.

## IV. *Standard of Review*

We review probate matters de novo, but we will not reverse findings of fact unless

they are clearly erroneous. *Remington v. Roberson*, 81 Ark. App. 36, 98 S.W.3d 44 (2003).

A finding is clearly erroneous when, although there is evidence to support it, we are left on

the entire evidence with the firm conviction that a mistake was made. *Id*. We defer to the

superior position of the trial court to weigh the credibility of the witnesses. *Id*.

## V. *Discussion*

### A. Procurement

The general rule in a will contest is that the party contesting the validity of the will

has the burden of proving by a preponderance of the evidence that the testator lacked mental

capacity at the time the will was executed or that the testator acted under undue influence.

*Looney v. Estate of Wade*, 310 Ark. 708, 839 S.W.2d 531 (1992). When a beneficiary procures

the making of a will, a rebuttable presumption of undue influence arises, which places on

the beneficiary the burden of going forward with evidence that would permit a rational

fact-finder to conclude beyond a reasonable doubt that the will was not the product of

insufficient mental capacity or undue influence. *Hodges v. Cannon*, 68 Ark. App. 170, 5

S.W.3d 89 (1999). Procurement of a will requires actual drafting of the will for the testator

or planning the testator's will and causing him to execute it. *Bell v. Hutchins*, 100 Ark. App.

308, 268 S.W.3d 358 (2007). Whether the beneficiary procured the making of a will is a

threshold question that must be answered in the affirmative before the beneficiary must offer

proof that the testator enjoyed both the required mental capacity and freedom of will. *Id.* Even if there is a finding of procurement, the presumption of undue influence does not shift the burden of proof. *Rose v. Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984). The burden, in the sense of the ultimate risk of nonpersuasion, never shifts from the contestant of the will. *Id.* "This does not, however, conflict with the rule concerning the burden of going forward with the evidence or the burden of evidence." *Id.* at 47, 679 S.W.2d at 183.

Pace argues that Cora and Darrell procured Ralph's will. We agree. The will that Jarboe prepared left everything to Cora and Darrell, despite the fact that Ralph had many other heirs. It was drafted strictly from Cora's notes without again consulting Ralph, who had earlier declined an opportunity to discuss the will with Jarboe. Cora made all the arrangements with Jarboe; Cora picked up and delivered the will for Ralph's signing at the hospital; and Darrell arranged for Ralph's friends to witness his signing of the will. Under this set of facts, we hold that the trial court clearly erred in finding no procurement because Cora and Darrell effectively planned Ralph's will and caused it to be executed. *See Smith v. Welch*, 268 Ark. 510, 597 S.W.2d 593 (1980); *In re Estate of Garrett*, 81 Ark. App. 212, 100 S.W.3d 72 (2003). We hold that, because Cora and Darrell procured Ralph's will, a rebuttable presumption of undue influence arose, and Cora had the burden of going forward with evidence from which a rational fact-finder could conclude beyond a reasonable doubt that Ralph's will was not the product of insufficient mental capacity or undue influence.

### B. Testamentary Capacity and Undue Influence

The questions of mental competency and undue influence are so closely related and interwoven that we consider them together. *Shepherd v. Jones*, 2015 Ark. App. 279, 461

S.W.3d 351. In a case where the mind of the testator is strong and alert, the facts constituting undue influence must be far stronger than a case in which the mind of the testator was impaired, such as by disease or advancing age. *Id.* Testamentary capacity means that the testator must be able to retain in his mind, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and relations of those entitled to his bounty. *Id.* The relevant inquiry is not the mental capacity of the testator before or after a challenged will is signed, but rather the level of capacity at the time the will was signed. *Id.* A testator's age, physical incapacity, and partial eclipse of mind will not invalidate a will if he or she has the requisite testamentary capacity when the will is executed, also known as a lucid interval. *Breckenridge v. Breckenridge*, 2010 Ark. App. 277, 375 S.W.3d 651.

Undue influence is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property. *Id.* Undue influence may be inferred from the facts and circumstances of a case, and cases involving questions of undue influence will frequently depend on a determination of witness credibility. *Id.* Arkansas courts look at many factors when deciding undue-influence issues, including the testator's physical and mental condition, the opportunity of the beneficiary "to mold the mind of the testator to suit his or her purposes," the existence of suspicious circumstances, and whether the property disposition is a natural one. *Beavers v. Williams*, 2015 Ark. App. 140, at 5 (citing *Orr v. Love*, 225 Ark. 505, 283 S.W.2d 667 (1955)).

First, Pace states that the medical records "are replete with evidence of [Ralph's] diminished capacity and dementia." She contends that Dr. Vellozo had "certified" that

Ralph suffered from dementia and had observed that Ralph's mental capacity was "waxing and waning." Pace points out that, on the day Ralph signed his will, the nurses' notes indicate that Ralph had "mild difficulty with appropriate decision making" and, shortly after he had signed the will, the notes indicate that Ralph had intense pain registering ten out of ten for which he was given hydrocodone.

The relevant inquiry is whether Ralph had the requisite mental capacity at the time the will was signed. *Shepherd*, *supra*. Dr. Vellozo indicated on February 1, 2013—three weeks after Ralph had signed the will—that Ralph could not sign a section on the nursing-home admission contract regarding a resident's responsibilities because he had dementia. There are, however, other medical records where the same doctor contradicted this by specifically indicating that there was no dementia diagnosis. Although the nurses' notes indicate that Ralph had mild difficulty with appropriate decision-making and may have been suffering intense pain around noon, witnesses present on the day Ralph signed the will said that he had not appeared to be in pain; that he had recognized them; that he had not appeared to be confused; and that he had seemed alert and attentive. These witnesses said that Ralph seemed to understand what he was doing, that he was "okay mentally," and that there did not appear to be anything wrong with Ralph's mind. Neither Don Nicholas nor Bobby Teel was surprised that Ralph had left everything to Cora and Darrell because of earlier statements made by Ralph when his mental capacity was not in question. Lavan Nicholas testified that, after she had read his will aloud, Ralph affirmed that the will was what he wanted. Our supreme court has upheld mental competency at the time of the

execution of the will even in the wake of evidence of some mental deterioration. *Noland v. Noland*, 330 Ark. 660, 956 S.W.2d 173 (1997).

Second, Pace argues that Cora and Darrell unduly influenced Ralph into leaving all his property to them. As support for this conclusion, she states that Cora and Darrell were in a position of trust with Ralph; that Ralph was old and vulnerable and had recently lost his wife; that Ralph was in a rehab hospital recovering from surgery at the time he executed the will; and that Ralph was dependent primarily on Cora and Darrell.

While all these statements are true, they do not support Pace's assertion that Ralph was therefore unduly influenced by Cora and Darrell. A testator's decision to favor a person with whom the testator had developed a close and affectionate relationship is not, in and of itself, proof that the favored beneficiary procured the will by undue influence. *Reddoch v. Blair*, 285 Ark. 446, 688 S.W.2d 286 (1985). Considering Teel's testimony about Ralph's reference to "all these other vultures"—presumably referring to Ralph's other relatives— we note that the testator may take into account, when considering his duties to relatives, past neglect, indifference, estrangement, and the like. *See Werbe v. Holt*, 218 Ark. 476, 237 S.W.2d 478 (1951). Further, while Ralph's age and physical condition are relevant factors to consider, we cannot say that they affected Ralph to the extent that his free will had been destroyed.

Our de novo review of the record shows that Cora presented ample evidence from which a rational fact-finder could conclude beyond a reasonable doubt that Ralph's will was not the product of insufficient mental capacity or undue influence. The ultimate burden of proving lack of capacity or undue influence by a preponderance of the evidence remained

on the party challenging the will, i.e., Pace. *Rose, supra.* Based on our de novo review of the evidence, or lack thereof, we conclude, as the trial court did, that Pace failed to meet her burden of proof by a preponderance of the evidence.

Affirmed.

HARRISON and GLOVER, JJ., agree.

*Parker Hurst & Burnett PLC*, by: *Donald L. Parker II* and *Ronald S. Burnett, Jr.*, for appellant.

*Glenn Lovett, Jr., PLC*, by: *Glenn Lovett, Jr.*, for appellee.